STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KIRK WILLIAM GARRISON,
*Defendant-Appellant.*

Lincoln County Circuit Court
084092; A146826

340 P3d 49

Peter Gartlan, Chief Defender, and Eric Johansen, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and David B. Thompson, Senior Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

Defendant appeals a judgment of conviction for multiple counts of first-degree sexual abuse, first-degree rape, second-degree unlawful sexual penetration, second-degree sodomy, and second-degree sexual abuse arising from abuse of his children. Defendant raises four assignments of error, challenging the trial court's denial of his mistrial motion, the calculation of his sentence, and the trial court's instructions to the jury regarding—and its acceptance of—a nonunanimous jury verdict. For the reasons that follow, we affirm.

Because defendant was found guilty, we state the facts in the light most favorable to the state. *State v. Zweigart,* 344 Or 619, 622, 188 P3d 242 (2008). We first set out the facts generally supporting defendant's convictions, supplementing them as necessary in our discussion of defendant's specific assignments of error.

Defendant married in 1996; the same year, defendant and his wife became licensed foster parents and began providing care for children. The couple separated in 2007, several months before the abuse underlying defendant's convictions came to light. Over the course of their marriage, defendant and his wife fostered "close to 100" children, eight of whom the couple adopted. Over that span, the couple would regularly have six or seven children in their home at a time.

Defendant's wife first learned that defendant had sexually abused their children in early 2007, after defendant had moved out of the family home. Evidence of the abuse surfaced during an argument with their child K, who had just turned 17. K told defendant's wife that he intended to move out of their home, and a physical struggle ensued. During the struggle, K revealed that defendant had sexually abused him, saying something to the effect of "you let your sick husband molest all of us children" and "[y]ou let that son of a bitch rape me." Thereafter, in an attempt to verify K's allegation, defendant's wife called another of her children, J. At that time, J, who is cognitively impaired, had recently turned 18 and was living in an adult group home. Defendant's wife asked J if defendant had abused her, and J confirmed that he had.

Defendant's wife then arranged to meet defendant to confront him about the allegations. During that meeting, defendant admitted to abusing J and explained that J "came on to" him. A third child, M, who was living with defendant, was present at that meeting, and defendant's wife insisted that defendant tell M what he had done. Defendant then told M that "he [had] sexually abused [K] and [J] and that he was really sorry." Ultimately the allegations reached the principal of K's school, and the principal immediately reported the abuse to a child-abuse-reporting hotline. Subsequently, defendant quit his job and left the state, ultimately settling with his mother in Long Beach, California.

Miller, a detective at the Lincoln County Sheriff's Office, was assigned to investigate the sexual-abuse allegations against defendant. Miller first attempted to interview defendant at his former Oregon home—a local trailer park—but discovered that defendant's trailer was gone. Miller then met with defendant's wife and interviewed K and M. Because Miller was concerned about J's cognitive impairment, Miller did not interview J; instead, she arranged to have J interviewed at the Children's Advocacy Center, an organization that counsels and interviews child victims of abuse. Miller also arranged interviews for defendant's younger children at the Children's Advocacy Center, as well as a number of children who had been fostered in defendant's home at various times. Eventually, Miller was able to reach defendant by telephone. During the call, defendant adamantly denied any wrongdoing and explained that he had left the area to care for his ailing mother.

In a 17-count indictment, defendant was charged with five counts of first-degree sexual abuse, ORS 163.427; three counts of first-degree rape, ORS 163.375; three counts of first-degree unlawful sexual penetration, ORS 163.411; three counts of second-degree sodomy, ORS 163.395; one count of second-degree sexual abuse, ORS 163.425; and two counts of coercion, ORS 163.275. The charges stemmed from defendant's abuse of J and K, as well as two younger children. Defendant was arrested and held in the Lincoln County Jail pending trial. Thereafter, Maeurer, an inmate at the jail, contacted Miller and explained that he had met and befriended defendant while both were incarcerated and

that defendant had made a variety of admissions to him about defendant's abuse of his children.

Defendant pleaded not guilty to the charges and proceeded to a jury trial, which was conducted over nine weeks from April to June 2010. At trial, the state elicited extensive testimony regarding the certification and operation of foster homes in general, as well as specifics regarding the circumstances of defendant's home. Both J and K testified regarding defendant's sexual abuse of them, and the recorded interview of J conducted at the Children's Advocacy Center was played for the jury. Maeurer also testified about his conversations with defendant in jail and related a number of graphic statements that he attributed to defendant.

The jury ultimately convicted defendant of two counts of first-degree sexual abuse, two counts of first-degree rape, one count of second-degree unlawful sexual penetration, one count of second-degree sodomy, and one count of second-degree sexual abuse for conduct involving J and K. The jury failed to reach a verdict on three counts of first-degree sexual abuse stemming from defendant's alleged abuse of the two other children, and the state dismissed those charges without prejudice. The state had dismissed the remaining charges against defendant during trial. The trial court sentenced defendant to 536 months' imprisonment, followed by lifetime post-prison supervision.

Defendant appeals, raising four assignments of error. We reject two of defendant's assignments—each relating to nonunanimous jury verdicts—without written discussion. In his remaining two assignments of error, defendant challenges the trial court's denial of a mistrial motion that defendant made following the admission of improper testimony by defendant's wife and the trial court's calculation of his sentence for his conviction of second-degree sexual abuse. For the reasons that follow, we affirm.

We turn first to the denial of defendant's mistrial motion. During redirect examination of defendant's wife at trial, the state inquired whether the family had ever been investigated by the Department of Human Services (DHS) for violations related to foster care. Defendant's wife testified that there had been "a couple over the years" but that

"nothing was founded." She then recounted two incidents that had resulted in DHS investigations:

> "[Witness:] I remember one time there—these kids that I was babysitting for one of the sheriffs and his wife, they had three little boys that we watched. And the allegation was that [defendant] used a drill—an electric drill that we have—and was touching them in the privates and chasing them around with it.
>
> "[State:] That was deemed to who to be unfounded?
>
> "[Witness:] By DHS.
>
> "[State:] Do you know why?
>
> "[Witness:] It was just their word against ours, I guess, or against his. He was babysitting the kids.
>
> "* * * * *
>
> "[State:] Did you ever have any allegation that either you or [defendant] were spanking children?
>
> "[Witness:] Yes, but that was unfounded too. I remember that now.
>
> "[State:] Tell me about that.
>
> "[Witness:] That's all I remember. They came to the house and talked to all the kids. It was that [defendant] had slapped one of the kids."

Defendant objected and, after the jury was excused, summarized his understanding of the allegations against defendant's family as (1) that K—not defendant, whose name is similar—had been chasing children around with a drill and touching them sexually and (2) that defendant had slapped another child. Based on that understanding, defendant moved to strike the testimony relating to the second alleged incident as impermissible character evidence under OEC 403 and OEC 404. Defendant also noted that he had a question regarding the first alleged incident and that, if the testimony had implicated defendant, he would need to move for a mistrial. The trial court sustained defendant's objection and granted his motion to strike the testimony relating to the second, slapping incident. The trial court also replayed the testimony relating to the first alleged incident.

Defendant moved for a mistrial immediately after the testimony was replayed, arguing that the state had engaged in prosecutorial misconduct. Defendant contended that the state's questioning evidenced the state's awareness of the sexual nature of the alleged incident, that defendant was never provided any discovery materials relating to the incident, and that the resulting testimony was improper and prejudicial. The state denied knowing of the sexual nature of the alleged incident, explained that it did not have a report of the incident because the incident had been reported in a different county, and obtained and provided the report to defendant during a brief recess. The state contended that the line of questioning was in response to defendant's implication—raised in his opening statements—that the family's problems with DHS began only after he had separated from his wife. The trial court deferred ruling on the motion and recessed for the evening.

After the court reconvened and heard additional argument the next morning, it denied defendant's mistrial motion. In doing so, the trial court discussed 12 appellate cases that had dealt with similar improper testimony, and concluded that the effect of the improper testimony could be obviated by a jury instruction. The court found that defendant's wife had volunteered the improper testimony unexpectedly, and it repeatedly emphasized that defendant's wife had "unflinchingly told the jury [that the allegation] was unfounded." It concluded:

"Obviously I wish the statement had not been made. Again, because of [defendant's wife] characterizing it as unfounded, I don't believe it has an unfair prejudicial effect. I don't think it's going to influence the jury. I think they will disregard it."

The court then allowed both parties to comment on a curative jury instruction, which it delivered after the jury returned:

"I'm going to give you an instruction right now that I need to ask you to pay close attention to, please. [Defendant's wife] was asked if DHS had ever conducted any investigation of possible wrongdoing while [defendant] still lived in the home, and [defendant's wife] responded by brief references to such investigations.

"I instruct you that [defendant's wife's] responses to all of those questions are stricken from this record. You are to completely ignore all of those particular responses about that DHS investigation about other events while [defendant] lived in the home completely. And I'm talking, again, only about the two such investigations that she mentioned and not about the entirety of her testimony.

"You are further instructed to report to this Court immediately if any other juror mentions any of [defendant's wife's] responses which I have ordered you to ignore, at any point from now on, including during your deliberations. [Defendant's wife's] stricken responses—that is to say they're stricken from the record the answers that I say can't be considered at all—the stricken responses must be completely excluded from your deliberations, both individually in your own thoughts and collectively as a group.

"How do you notify me? Simply write me a note, hand it to the bailiff either when we're in session or during a recess, and I'll share your note with the parties at that point. So you can do that individually and confidentially if the need should arise. That'll be the extent of the instruction at this point."

On appeal, defendant renews his arguments below, contending that the line of questioning was designed to elicit the improper testimony and that the resulting prejudice was not cured by the court's instruction. In response, the state notes that the trial court found that the state was unaware of the sexual nature of the report and, therefore, did not intentionally elicit the improper testimony. The state also contends that the trial court's decision to give a curative instruction was well within the bounds of reason and, therefore, the denial of the mistrial motion was not an abuse of discretion.

We review the denial of a mistrial motion for abuse of discretion. *State v. Thompson*, 328 Or 248, 271, 971 P2d 879 (1999). "In ruling on a motion for a mistrial, a trial court must decide whether to grant the motion, to cure the effect of inappropriate conduct or testimony by giving a proper instruction instead, or to do nothing at all." *State v. Evans*, 211 Or App 162, 166, 154 P3d 166 (2007), *aff'd*, 344 Or 358, 182 P3d 175 (2008). "The trial judge is in the best position to assess the impact of the complained-of incident and to

select the means (if any) necessary to correct any problem resulting from it." *State v. Wright*, 323 Or 8, 12, 913 P2d 321 (1996); *see also State v. Clark*, 171 Or App 1, 6, 14 P3d 626 (2000) (determination whether to grant a mistrial motion "is addressed to the sound discretion of the trial judge, because that judge is in the best position to assess and rectify any potential prejudice to the defendant"). A trial court abuses its discretion if its decision is outside the range of legally permissible choices, *State v. Deloretto*, 221 Or App 309, 321, 189 P3d 1243 (2008), *rev den*, 346 Or 66 (2009), or exceeds the bounds of reason, *State v. Agee*, 223 Or App 729, 735, 196 P3d 1060 (2008).

On this record, we conclude that the trial court did not abuse its discretion. As an initial matter, the events that gave rise to defendant's mistrial motion did not involve the type of misconduct or constitutional violation for which a curative instruction is insufficient as a matter of law. *Cf. State v. Johnson*, 199 Or App 305, 313-14, 111 P3d 784, *rev den*, 339 Or 701 (2005) ("Thus, the case falls within [the rule announced in *Bruton v. United States*, 391 US 123, 136-37, 88 S Ct 1620, 20 L Ed 2d 476 (1968)]; the trial court's decision that the redactions, in combination with a precautionary jury instruction, sufficed to rectify any constitutional infirmity, was legal error. Denying defendant's motion for a mistrial was therefore beyond the court's discretion and was legal error."). Instead, defendant argues that the improper testimony was so inherently prejudicial that the trial court unreasonably concluded that a curative instruction could rectify any prejudiced caused by it. We disagree.

There are two difficulties with defendant's position. The first is that it conflicts with the trial court's characterization of the improper evidence's prejudicial effect. In addition to its repeated observation that defendant's wife testified that the allegation had been unfounded, the court observed that

"if the jury were to try to make any unfair use of the information—if there was any proclivity on the part of any juror to improperly consider this—they couldn't help but notice that the father of the alleged victims was a deputy sheriff. So if you were to let your mind run wild, it would be not just that DHS thought it was unfounded, but that * * * efforts

to contact his children sexually would not go unnoticed by a deputy sheriff. * * * [I]t would support the inference that it was unfounded if there was no evidence that any charge was ever filed."

Although defendant challenges that characterization, reviewing the trial court's decision for an abuse of discretion, we do not think it unreasonable.

The second difficulty with defendant's position is that we assume that a jury has followed a court's curative instruction unless there is an "overwhelming probability" that the jury was incapable of following the instruction. *State v. Vorce*, 170 Or App 61, 65, 11 P3d 674 (2000), *rev den*, 331 Or 584 (2001). Defendant does not identify why there is an "overwhelming probability" that the jury was incapable of following the trial court's detailed instruction, and nor can we. A bare assertion by defendant that such a probability exists does not persuade us that the jury was incapable of following the court's curative instruction in this case. Accordingly, the trial court did not abuse its discretion in denying defendant's mistrial motion.

We turn to defendant's challenge to his sentence. In imposing sentence on Count 7 (second-degree sexual abuse), the court categorized defendant as a "7-A" offender under the sentencing guidelines and imposed a presumptive sentence of 36 months' incarceration, consecutive to the sentences imposed on Count 1 (first-degree sexual abuse), Count 2 (first-degree rape), Count 3 (first-degree rape), and Count 4 (second-degree unlawful sexual penetration). Defendant objected and argued that, if the court were to impose a consecutive sentence on Count 7, it should apply the shift-to-I rule and categorize defendant as a "7-I" offender.[1] *See* OAR 213-012-0020(2)(a)(B) (trial court must shift to the Criminal History I Column when calculating consecutive sentences arising from the same criminal episode). Defendant reprises that argument on appeal, contending that his conviction for Count 7 was "so closely linked in time, place and circumstances * * * that a complete account of Count 7 could not be

---

[1] Each of defendant's other convictions was subject to a mandatory minimum sentence under Measure 11; thus, the shift-to-I rule did not apply to them. *State v. Monro*, 256 Or App 493, 495-96, 301 P3d 435 (2013).

related without relating details of either Count 1, 2, 3, or 4," and, therefore, that the trial court erred when it failed to apply the shift-to-I rule.

As we have explained,

> "'[t]he "shift-to-I" rule applies when a defendant is sentenced for multiple felonies in the same proceeding. In that event, the defendant's true criminal history score is used in assessing the gridblock for imposing sentence on the primary offense (and any other offenses for which sentences will run concurrently). OAR 213-012-0020(2)(a)(A). For additional offenses for which consecutive sentences will be imposed, the court is required to use the criminal history score "I." OAR 213-012-0020(2)(a)(B).'"

*State v. Monro*, 256 Or App 493, 495, 301 P3d 435, *rev den*, 354 Or 148 (2013) (quoting *State v. Mayes*, 234 Or App 707, 709 n 1, 229 P3d 628, *rev den*, 348 Or 669 (2010)).

The rule does not apply to "consecutive sentences imposed for crimes that have different victims." OAR 213-012-0020(5); *State v. McNeil*, 170 Or App 407, 12 P3d 992 (2000). Nor does it apply to consecutive sentences that stem from different criminal episodes. *See Orchard v. Mills*, 247 Or App 355, 358, 270 P3d 309 (2011), *rev den*, 352 Or 33 (2012) ("[T]he 'shift-to-I' rule applies only when consecutive sentences are imposed for crimes that arise from a single criminal episode."); ORS 131.505(4) (defining "criminal episode" as "continuous and uninterrupted conduct that * * * is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective").

As an initial matter, Counts 1, 2, 3, 4, and 7 each involved the same victim, J. Thus, the dispositive issue on appeal is whether defendant's conviction for Count 7 arose from the same criminal episode as Counts 1, 2, 3, or 4. That is a legal question. *See State v. Fore*, 185 Or App 712, 716-17, 62 P3d 400 (2003). However, that legal determination "is based on a factual finding[—]specifically, the finding that the acts giving rise to the convictions were not part of 'continuous and uninterrupted conduct.'" *State v. Yashin*, 199 Or App 511, 514, 112 P3d 331, *rev den*, 339 Or 407 (2005). If the trial court made such findings, we defer to them to the

extent that they are supported by evidence in the record. *Fore*, 185 Or App at 716-17. If the trial court did not make an express finding, and there is evidence from which facts could be decided in more than one way, we presume that the facts were decided in a manner consistent with the trial court's decision. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

As noted, on appeal, defendant contends that the convictions at issue "arose from the same continuous and uninterrupted course of conduct" and that the convictions were "so closely linked in time, place and circumstances * * * that a complete account of Count 7 could not be related without relating details of either Count 1, 2, 3, or 4." Defendant puts forward a three-part argument in support of his position. First, defendant contends that, as set out in his indictment, the pertinent counts had identical date ranges and, aside from the two counts of first-degree rape, lacked specific identifying factors. Second, he contends that the evidence presented at trial "established that the various sexual acts occurred during the same incidents." Finally, he contends that the jury was instructed with general wording similar to that found in the indictment. Reviewing the record, we disagree.

At trial, J, who had been placed in defendant's home when she was eight or nine years old, testified that she did not remember when defendant began abusing her. Her first memory of abuse occurred in the living room of defendant's home; she was sitting on the couch with defendant, and he placed his hands inside her shirt and her underwear. On three occasions, defendant had inserted part of his hands into her vagina. On several occasions, defendant had J perform oral sex on him in the living room and in defendant's bedroom. Also on several occasions, defendant touched J's breasts and had her touch his penis while defendant was driving. J also recounted various instances of abuse that occurred in defendant's bedroom. Specifically, J testified that defendant had made her touch his penis, that he would touch her on her breasts and vagina, that defendant put his mouth on her vagina, and that defendant had engaged in vaginal intercourse with her when she was twelve years old. Finally, J testified that on a number of occasions K would touch her breasts while defendant was in the room.

Likewise, K testified that he was placed in defendant's home when he was eight years old and that defendant began abusing him shortly thereafter. In addition to recounting multiple instances in which defendant had abused him, K testified that, when he was 10 or 11 years old, defendant began instructing K and J, who was one year older, to have vaginal intercourse. K recalled three separate occasions in which that had occurred. K explained that, the first time, he had watched defendant engage in vaginal intercourse with J on their living room couch and that defendant told K to do the same thing. K also testified that he had witnessed numerous other instances in which defendant had abused J. K testified that, on one occasion, he had come home from a school dance and heard a commotion coming from J's bedroom. From the hallway, K heard J telling defendant to stop. He opened the bedroom door and saw defendant engaging in vaginal intercourse with J on the bedroom floor. He testified that, during his time in defendant's home, he had seen defendant touching J's genitalia with his hand or penis "upwards of 20" times, that he had seen defendant kissing J and touching her breasts "a lot more than that," and that he had seen J performing oral sex on defendant several times.

Maeurer testified that he had been placed in protective custody at the Lincoln County Jail. Over the course of a month there, he met and befriended defendant. During that time, defendant admitted to Maeurer that he had sexually abused his children. Specifically, defendant admitted that he had engaged in sexual intercourse with K, J, and another child. Maeurer recounted defendant admitting to engaging in multiple episodes of abuse similar to those described in the testimony of J and K—*viz.*, abusing J during car rides, engaging in vaginal intercourse with J, sodomizing both children, and directing J and K to engage in vaginal intercourse with each other while defendant watched.

Thus, although defendant is correct that the evidence presented at trial tended to show that "various sexual acts occurred during the same incidents"—that is, there was evidence that defendant often engaged in multiple sexual acts with J during individual incidents of abuse—that does little to further defendant's position. That is because the evidence at trial also established that defendant engaged

in many, distinct episodes of abuse over many years. And, more to the point, it established that the criminal episode giving rise to Count 7 was distinct from those giving rise to Counts 1, 2, 3, and 4.

As a starting point, we note that defendant does not identify the "criminal episode" that gave rise to his conviction in Count 7. Leaving aside any dearth of identifying factors in either the indictment or the jury instructions—neither of which are at issue on appeal—the pertinent conduct underlying Count 7 was made clear at trial, both to the court, in response to defendant's motion for a judgment of acquittal, and to the jury, in the state's closing argument:[2] It was the incident in which K returned home from a school dance to find defendant engaging in vaginal sex with J in J's bedroom.

The record is equally clear as to the conduct giving rise to Counts 1, 2, and 3. For each of those counts, the state identified a particular incident of abuse, distinct from the incident giving rise to Count 7, that was recounted in detail in the testimony of either J or K. For Count 1 (first-degree sexual abuse), the state identified J's testimony regarding her first memory of abuse—*viz.*, defendant placing his hands inside her shirt and underwear while they were sitting together on the couch in the living room. For Count 2 (first-degree rape), the state identified J's testimony regarding vaginal intercourse in defendant's—not J's—bedroom. For Count 3 (first-degree rape), the state identified K's testimony that he had observed defendant engage in vaginal intercourse with J in the living room before instructing K to do the same.

Finally, although the state was unable to point to a specific incident of abuse underlying Count 4—as it had

---

[2] For example, in response to the motion for a judgment of acquittal, the state identified the conduct and the location of the testimony in the record:

"Count seven, you will find on April 22, 2010 at 1:36:00. And that's sex abuse in the second degree. That's the discussion where [J] was being raped by [defendant] in her bedroom and [K] came home from the dance and he saw her. *** There's information that she was fighting back. There's not an age requirement on count seven."

The state identified the same conduct, though in more detail, to the jury during its closing argument.

with Counts 1, 2, 3, and 7—it identified J's testimony that defendant had inserted a part of his hand into her vagina three times. Even were we to assume that one of those instances occurred during the same criminal episode as the vaginal intercourse that gave rise to Count 7, according to J's testimony, two instances remain. Further, although the state did not specifically rely on K's testimony, he testified that he had observed defendant touching J's vagina "a lot more" than 20 times, and, specifically, that he had observed defendant penetrating J's vagina with his finger on an occasion distinct from the incident in J's bedroom.

In calculating defendant's sentence for Count 7 under grid block 7-A, the trial court implicitly found that the conduct underlying Count 4 was not a continuous and uninterrupted part of the conduct underlying Count 7. There is ample evidence supporting that implicit finding, and we therefore defer to it. *Gladden*, 250 Or at 487. Accordingly, because the conduct underlying defendant's conviction on Count 7 was not part of the same "continuous and uninterrupted conduct" that formed the bases for defendant's other convictions, we conclude that the conduct in Count 7 was not directed toward the accomplishment of the same criminal objective as Counts 1, 2, 3, or 4. *See* ORS 131.505(4); *Orchard*, 247 Or App at 358. Nor did "'a complete account of [Count 7] *necessarily* include[] details of [Counts 1, 2, 3, or 4.]'" *State v. Witherspoon*, 250 Or App 316, 322, 280 P3d 1004 (2012) (quoting *State v. Potter*, 236 Or App 74, 82-83, 234 P3d 1073 (2010)) (emphasis in *Witherspoon*). In short, Count 7 constituted a distinct "criminal episode," and, it follows, the trial court did not err when it declined to apply the shift-to-I rule in calculating defendant's sentence. *Orchard*, 247 Or App at 358.

In sum, the trial court did not abuse its discretion when it denied defendant's mistrial motion. Nor did it err when it calculated defendant's sentence for Count 7 under grid block 7-A.

Affirmed.