728 December 28, 2023 No. 681

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

PETER JOHNSON,
*Defendant-Appellant.*

Jackson County Circuit Court
19CR14005; A176792

David J. Orr, Judge.

Submitted November 13, 2023.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Ingrid A. MacFarlane, Chief Deputy Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Hadlock, Judge pro tempore.

AOYAGI, P. J.

Affirmed.

## AOYAGI, P. J.

Defendant was convicted of two counts of first-degree sodomy, ORS 163.405, and two counts of first-degree sexual abuse, ORS 163.427. On appeal, he contends that the trial court erred in failing to declare a mistrial after a witness vouched for the complainant. Specifically, he argues that the court erred in denying his motion for a mistrial or, in the alternative, if that motion was made too late, that the court plainly erred by not declaring a mistrial *sua sponte*. We agree with the state that the court took appropriate corrective action to address the situation, including striking the testimony, giving a detailed curative instruction, and giving a final instruction that reiterated the jury's singular responsibility for making credibility determinations. The trial court did not abuse its discretion by denying a mistrial and instead taking the actions that it did. Accordingly, we affirm.

### FACTS

In 2018, defendant and his three-year-old daughter, M, were living with a family friend, Stafford. Defendant went to California in December to visit his ailing sister and ended up staying there into 2019. While defendant was gone, M described sexual abuse by defendant to Stafford. Stafford contacted the authorities. Detective Reynolds subsequently interviewed M, who again described sexual abuse by defendant. Defendant was arrested in March 2019 upon his return to Oregon. Defendant made some incriminating statements in a police interview. He was later indicted, and the charges against him were tried to a jury.

During trial, the prosecution played a video of Reynolds's interview of M. After playing the video, the prosecutor asked Reynolds the following question, and Reynolds gave the following answer:

"[PROSECUTOR]:   Based on your training and experience interviewing children, what stood out to you in regard to [M's] disclosure to you?

"[REYNOLDS]:   Some of the things that stood out to me was her reluctance to talk about it, the sensory stuff that she described, the—*the things she talked about that*

*made me realize based on my training and experience
that she was talking about something she actually experi-
enced.* For instance, if you heard her say that it happened
almost—I think she said it happened every night.

"In my training and experience, when you talk to some-
body that's been abused over and over and it's the same
thing every time it tends to all blur together, they can't
even single out a certain event unless something unusual
happened during that event.

"And in this case with [M], she talked about somebody
interrupting them and Dad having to pull his pants up *and
that just really stood out as something it was obvious to me
she had truly experienced.*"

(Emphases added.)

Defense counsel did not object to the foregoing testi-
mony, and Reynolds continued testifying for a few more min-
utes (five transcript pages), until the trial concluded for the
day. After the jurors exited the courtroom, the court advised
the prosecutor and defense counsel that it wanted to meet
with them in chambers the next morning before the trial
resumed. The court explained that "there may be a reason
to strike some testimony," specifically Reynolds's answer to
the above-quoted question, and that the court would play
the recording in chambers when they met.

The next morning, the court met with the prosecu-
tor and defense counsel as planned. Afterwards, the court
put on the record that the meeting had occurred, including
that its purpose was to discuss how to address the fact that
Reynolds had given some testimony the prior day that vio-
lated the vouching rule. The court noted that it was "still not
clear on whether the defense chose not to object to that as
a strategic approach to in the hope of *** arguing that the
witness was biased." The court then asked defense counsel
how he wanted to proceed now that he had spoken to his
client. Defense counsel at that time moved for a mistrial.
Describing the case as a pure credibility contest, defense
counsel argued that a limiting instruction was not enough
and that a mistrial was necessary, because it was "just such
a substantial issue that I don't believe that he can have a fair
and impartial jury just based on this credibility evidence."

The trial court initially stated that it did not believe that a mistrial was "on the table at this point because there was no objection at any point." Defense counsel responded that, under the case law, "the judge themselves is supposed to take care of it" even if the defense misses it. The court stated that it understood, then asked the state's position. The prosecutor agreed that Reynolds had "crossed the line into vouching" and requested that her answer be stricken and that a limiting instruction be given.

The court denied defendant's motion for a mistrial, reasoning that the testimony should not have come in but that it could be adequately addressed by striking it and giving curative instructions. The court concluded by stating, "It didn't appear to me that the way that that testimony came out had such a—had the kind of impact that does require a mistrial. I think it's a matter that can be cured through limiting instructions."

The court then called in the jury and stated as follows to the jury:

"All right. It looks like all the jurors—all the jurors are back and seated and ready to go and so we'll resume, basically, where we left off yesterday, except that there is another instruction.

"Usually, most of the instructions are given at the beginning and at the end, but because of the way things developed, there is an instruction that I'm going to read now. And then I am also going to talk about some testimony that you heard that I'm going to order stricken.

"If you recall, the initial instructions that I gave yesterday I talked about sometimes I may order that evidence be stricken from the record and you shouldn't give that any weight, and so we'll be doing that here in just a moment. So here is the actual, the legal instruction that applies:

"It is for you, and you alone, to decide whether to believe a witness's testimony.

"Witnesses are not permitted to give opinions on whether another witness is, or was, being truthful in any given statement. And I'm gonna add there a statement in the witness stand or a statement outside of court.

"Despite the court's efforts to prevent such testimony, a witness's testimony occasionally can be interpreted as an opinion on another witness's truthfulness in regard to a particular statement. Again, whether that statement is in court or out of court. If that occurs, you should not give any weight to the witness's opinion about the credibility of that statement.

"You are the sole arbiters of the facts in this case and thus must disregard any other witness's opinion about the credibility of any account of the underlying events.

"So yesterday after we finished watching the video there was a question posed to the witness which was something along the lines of did—did something stand out to you about that video.

"So I don't want to call particular attention to the particular things that were said, because the idea is that it be stricken, but basically from that point on everything that was said about—about the—or anything that might have been said about the—the statements made by the child in the video is stricken. That means you must give it no weight whatsoever. Zero. Nada.

"Anything that was said about the credibility of—of a statement by—by the—by the child is stricken. And again, zero, zero weight is to be given to it. None whatsoever."

The trial continued. Late in the day, the parties gave their closing arguments, and the court gave the jury its final instructions. The final instructions included:

"It is for you, and you alone, to decide whether to believe a witness's testimony.

"Witnesses are not permitted to give opinions on whether another witness is, or was, being truthful in any given statement."

"Despite the court's efforts to prevent such testimony, a witness's testimony occasionally can be interpreted as an opinion on another witness's truthfulness in regards to a particular statement. If that occurs, you should not give any weight to the witness's opinion about the credibility of that statement.

"You are the sole arbiters of the facts in this case and thus must disregard any other witness's opinion about the credibility of any account of the underlying events."

After deliberation, the jury found defendant guilty on all four counts. Defendant appeals the resulting judgment of conviction.

## ANALYSIS

Defendant argues that the trial court erred in denying his motion for a mistrial or, in the alternative, if that motion was made too late, that the court plainly erred by not declaring a mistrial *sua sponte* as soon as Reynolds gave vouching testimony. We review the denial of a motion for mistrial for abuse of discretion. *State v. Wasyluk*, 275 Or App 149, 150, 363 P3d 519 (2015).

"Vouching" refers to the expression of one's personal opinion about the credibility of a witness. *See State v. Chandler*, 360 Or 323, 330-31, 380 P3d 932 (2016) (discussing history of the "judicially created" prohibition on vouching). Because credibility determinations are the exclusive province of the jury, witnesses are categorically prohibited from expressing a view on whether another witness is "telling the truth." *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983); *accord State v. Black*, 364 Or 579, 587-88, 437 P3d 1121 (2019). "The rule applies to both direct comments and other statements, whether made in or out of court, that are 'tantamount' to comments on the veracity of other witnesses." *State v. Sperou*, 365 Or 121, 128, 442 P3d 581 (2019) (quoting *Chandler*, 360 Or at 331).

When a witness improperly vouches, the trial court has discretion how to address the situation, which means that the court may address it in any manner that comes within "the range of legally permissible choices." *State v. Garrison*, 266 Or App 749, 756, 340 P3d 49 (2014), *rev den*, 356 Or 837 (2015). Striking the offending testimony and giving curative instructions are permissible choices, unless they are "insufficient to cure the problem as a matter of law." *State v. Williams*, 276 Or App 688, 696, 368 P3d 459, *rev den*, 360 Or 423 (2016) (citing *State v. Wright*, 323 Or 8, 19, 913 P2d 321 (1996)). With respect to curative instructions, we presume that juries follow instructions, unless there is "an overwhelming probability" that they are unable to do so. *State v. Smith*, 310 Or 1, 26, 791 P2d 836 (1990).

Here, it is undisputed that Reynolds's answer regarding what stood out from M's interview included improper vouching for M. The only question is whether the trial court adequately addressed the situation by striking that testimony and giving curative instructions or, conversely, whether it was required to declare a mistrial.

For present purposes, we assume *arguendo* that defendant moved for a mistrial quickly enough to adequately preserve the claim of error for appeal. *See State v. Cox*, 272 Or App 390, 405, 359 P3d 257 (2015) (explaining that a motion for a mistrial may be considered timely, even if not made instantaneously, as long as the circumstances allow the trial court to take prompt curative action).

We agree with the state that the trial court adequately addressed the situation. That is, its actions were not "insufficient to cure the problem as a matter of law." *Williams*, 276 Or App at 696. *Williams* is instructive. There, in a child sexual abuse prosecution, the jury heard a 45-minute audio recording of a police interview, during which the officer told the defendant that he could "read" body language, said that he could tell from the defendant's body language that he was "holding something back" and not being entirely truthful, and pointed to specific physical movements by the defendant that he said indicated to him that the defendant was lying. *Id.* at 691-92. The defendant made a vouching objection early in the playing of the recording, which was overruled, and, at the end of the playing of the recording, he moved for a mistrial, arguing that the jury hearing the vouching was so prejudicial that it could not be cured. *Id.* at 692-93. The trial court denied the motion for a mistrial, but it instructed the jury both orally and in its written instructions to disregard the officer's comments on the defendant's credibility. *Id.* at 693. On appeal, we held that the court did not abuse its discretion. *Id.* at 697.

The vouching testimony in this case was arguably more powerful than that in *Williams*—while testifying at trial, Reynolds expressed her view that the very young complainant was credible, and she explicitly referenced her training and experience in doing so—although Reynolds's statements were also briefer and more spontaneous and

thus harder to avoid the jury hearing than the recorded statements in *Williams*. Certainly, the trial court needed to take action, even absent an objection. *See Davis v. Cain*, 304 Or App 356, 368, 467 P3d 816 (2020) ("[V]ouching by witnesses is so inherently problematic that the Supreme Court has advised trial judges to summarily cut off a vouching question to a witness, *sua sponte*, 'before a jury is contaminated by it.' *State v. Milbradt*, 305 Or 621, 630, 756 P2d 620 (1988). Relatedly, at least with respect to 'true' vouching, a trial court may commit plain error if it fails to *sua sponte* address vouching by a witness."); *State v. McQuisten*, 97 Or App 517, 520, 776 P2d 1304 (1989) (reversing for a new trial where the court allowed into evidence a recording of a police interview in which a police officer made statements to the defendant indicating that he believed the complainant).

The trial court *did* take action, however, that was prompt, thoughtful, and thorough. Specifically, the court:

- Recognized the potential vouching problem and raised it to the parties, even though defendant had not objected.

- Considered the case-specific circumstances in deciding whether striking the testimony and giving curative instructions would be adequate to ensure a fair trial.

- Struck the vouching testimony from evidence.

- Gave a clear and specific curative instruction to the jury close in time to the vouching.

- Gave final instructions to the jury that reiterated the jury's singular responsibility for making credibility determinations.

We are not persuaded that this is a circumstance in which there is an overwhelming probability that the jury could not follow its instructions. The court therefore did not abuse its discretion in denying a mistrial and instead taking the actions that it did to address Reynolds's improper vouching statements.

Affirmed.