Argued and submitted September 18, 2013, affirmed March 30, petition for review denied August 4, 2016 (360 Or 235)

JAMES ALAN GRANT,
*Petitioner-Appellant,*

*v.*

Rick COURSEY,
Superintendent,
Eastern Oregon Correctional Institution,
*Defendant-Respondent.*

Umatilla County Circuit Court
CV110555; A150332

370 P3d 892

Rankin Johnson, IV, argued the cause for appellant. David J. Celuch filed the opening brief for appellant. Erin Galli and Galli Law Office, LLC, filed the reply brief for appellant.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the brief were Mary H. Williams, Deputy Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and DeVore, Judge, and Schuman, Senior Judge.*

DUNCAN, P. J.

---

* DeVore, J., *vice* Wollheim, S. J.

## DUNCAN, P. J.

A jury in petitioner's underlying criminal trial found him guilty of providing liquor to three minors and committing sexual offenses against one of them. In a petition for post-conviction relief, petitioner alleged that his trial counsel provided constitutionally inadequate assistance by (1) failing to object to or move for a mistrial based on improper remarks by the prosecutor during closing arguments, including the prosecutor's mischaracterization of key testimony and her suggestion that petitioner had sexually abused others and, if acquitted, would do so again; and (2) failing to object to the prosecutor's comment on defendant's invocation of his rights to counsel and to remain silent. The post-conviction court rejected petitioner's arguments, concluding that parts of the prosecutor's closing arguments, although "inartful," were nonetheless "within bounds"; that petitioner's trial counsel made a reasonable tactical choice as to handling the comment on petitioner's invocation of constitutional rights; and that, in any event, petitioner was unable to demonstrate that he had been prejudiced by any of his attorney's alleged mistakes. For the reasons that follow, we affirm the judgment of the post-conviction court.

## I.   BACKGROUND

We state the facts consistently with the post-conviction court's express and implicit factual findings. *Montez v. Czerniak*, 355 Or 1, 8, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014). In October 2007, petitioner was living in a travel trailer on land owned by his mother in Hood River, Oregon. Petitioner's mother lived in a house on the property, along with two of her granddaughters, JJ and JE. On a Friday that October, petitioner's brother, John, came from Washington with his daughter, AG, along with AG's friend, SM, and spent the weekend at the Hood River property.

A few months later, in December 2007, AG disclosed that she had been abused by petitioner during that visit. Subsequently, her cousin, JJ, was interviewed by a detective and told him that she had seen petitioner intentionally grabbing AG's breasts during the visit. Petitioner learned about the allegations against him, and he retained legal counsel,

who then informed the Department of Human Services (DHS) that any interviews would need to be arranged through counsel. Petitioner was not interviewed by DHS or detectives but was instead arrested and charged with attempted rape, second-degree unlawful sexual penetration, two counts of sexual abuse, and three counts of furnishing liquor to minors.

At trial on those charges, the state presented evidence of the following events. On the evening that John, AG, and SM arrived in Hood River, petitioner and John went out drinking. Some of the girls—AG, SM, and JJ—went to petitioner's trailer to play on the Internet. The girls, who were minors at the time, found petitioner's liquor cabinet and began drinking beer and hard lemonade. When petitioner returned home, the girls originally hid their drinking, but petitioner subsequently joined them and actually mixed drinks for them with rum and cola.

After an hour of drinking, AG vomited from the alcohol. JJ and SM left to sleep in petitioner's bedroom, leaving AG and petitioner alone in a different part of the trailer. AG awoke when she felt a pinch on her breast, and found petitioner with his hand down her shirt and touching her bare breasts. Petitioner then pulled AG's jeans down to her knees, digitally penetrated her vagina, and unsuccessfully attempted to insert his penis in her vagina.

The state's witnesses included JJ, who previously had told a detective that she had seen petitioner intentionally grabbing AG's breasts numerous times, that she herself was afraid to be alone with petitioner, and that petitioner had mixed several drinks for them on the night of the abuse. At trial, though, JJ backtracked from her interview statements, testifying that petitioner had touched AG's breasts accidentally during the course of the evening, that she—JJ, not petitioner—had mixed the drinks for the girls, and that she had simply told the detective "what they wanted to hear" in order to "save [her] butt" (*i.e.*, avoid punishment for being a minor in possession of alcohol). However, the state also elicited evidence that cast doubt on JJ's explanation for changing her story at trial. JJ acknowledged that she had been experiencing significant stress because family

members had been talking to her about what she told police and what would happen if petitioner were convicted; that she felt conflicted about being caught between her uncle and her cousin; that petitioner's trial attorney had met frequently with her about ways in which to explain away her earlier interview; and that she wanted to get out of the stressful environment that had been created by the criminal case. The state's redirect examination ended with the following exchange:

"[PROSECUTOR:] And the easiest way of getting away from all that is to say it didn't happen the way it happened when you told it to [the detective]; isn't that right?

"[JJ:] Repeat that.

"[PROSECUTOR:] Isn't the easiest way to make this all better is to take it back what you said to [the detective]?

"[JJ:] Yeah."

At that point, the trial court allowed the prosecutor and defense counsel to ask questions submitted by the jurors. One of those questions prompted this exchange:

"[PROSECUTOR:] And when you were being questioned by Detective Davidson, did they—did they ask you if you saw your uncle touching specific body parts, or did you make them—did you make the statement without them mentioning any parts of the body. And that was kind of a tough—how did—how was the question asked by Detective Davidson about what you saw?

"[JJ:] They just asked me. I don't know.

"[PROSECUTOR:] Well, can you tell the jury what he was asking you about?

"[JJ:] If they—they just asked me what I saw.

"[PROSECUTOR:] Okay. And when they asked you what you saw, did they mention any particular body parts like his penis or his hand or her vagina?

"[JJ:] No.

"[PROSECUTOR:] *So what was your response when they asked you what you saw?*

"[JJ:]  *That—pretty  much  what  I  said  in  the  police report.*

"[PROSECUTOR:]  *If it's in the police report, is that what you said?*

"[JJ:]  *Yeah.*

"[PROSECUTOR:]  Yeah?

"[JJ:]  Yeah.

"[PROSECUTOR:]  Okay."

(Emphasis added.)

The defense, meanwhile, offered an alternative version of what transpired at the trailer. According to petitioner, who testified at trial, he had not served the girls any additional drinks after he arrived back at the trailer that night. Rather, they were already intoxicated by the time he returned, and, upon realizing that they had been drinking, he told them that it was time to go to bed. JJ asked whether they could sleep at the trailer, and petitioner agreed. While JJ and SM went to bed in petitioner's bedroom, AG insisted on staying up later and sat down at the computer. After a minute or so, AG vomited suddenly. Petitioner tried to get her to go to bed, but she refused. Petitioner then moved her closer to the heat source in the trailer, removed her shoes, and put her in a sleeping bag. At no point, petitioner testified, did he ever touch AG's breasts, put his hands in her pants, or attempt to rape her.

Toward the end of his direct examination of petitioner, petitioner's counsel asked him questions about conversations that petitioner had with others about AG's allegations. After petitioner testified that he had not talked by phone with AG about the allegations, his counsel inquired, "After that, did you talk to anyone else about this issue?" Petitioner responded that he had talked to his sister, a legal secretary, who said, "'You need to go talk to a lawyer,' because it was right after this that the DHS said they was coming down, and—and they going to do the reporting[.]" Trial counsel then followed up by asking whether petitioner had talked with DHS, and petitioner testified that various people had advised him to get an attorney because the DHS

investigator could "get things mixed up" and "rattle" petitioner. Counsel then asked petitioner whether he had talked to "any investigators at all." Petitioner responded, "I never talked to anybody. Nobody came and talked to me."

At the beginning of her cross-examination, the prosecutor immediately followed up on whether petitioner had talked with investigators. She had the following exchange with petitioner:

"[PROSECUTOR:] Good afternoon, [petitioner]. You testified that nobody ever came out and talked to you. In the last year and a half this case has been pending, did you ever go to the police and tell them what you've told us today?

"[PETITIONER:] No, I did not.

"[PROSECUTOR:] And you said you've had a year and a half to think about this; when did you first recall that you had to grab the side of her hips to move her, when did you first remember that?

"[PETITIONER:] I'm remembering when I was— when I moved her. I mean, she was laying on the floor deadweight, and the only way I could move her was pick her up off the floor just a little bit and push her over, and that was—I've never had to remember that, that was a fact.

"[PROSECUTOR:] And who is the first person that you shared that fact with?

"[PETITIONER:] That I moved her?

"[PROSECUTOR:] That you grabbed her hips to move her.

"[PETITIONER:] With my lawyer.

"[PROSECUTOR:] And you never shared that with police?

"[PETITIONER:] Nobody talked with me from the police.

"[PROSECUTOR:] And you didn't seek out law enforcement as well.

"[PETITIONER:] No, I did not.

"[PROSECUTOR:] And there was a card, I believe, left at your house?

"[PETITIONER:]   It was left at my mom's house, and she called DHS, but when she got there the next Sunday—Saturday, and nobody returned her call until Wednesday, and that's when [the DHS investigator] wanted to see me the next day or two, and then I went to the lawyer, and he wrote a letter saying that you want to talk to me, then you need to make an appointment with him."

Through subsequent questions, the prosecutor elicited testimony that petitioner had not provided any details of the event to the officer who came to arrest him. Petitioner testified, "[I]t's not his responsibility. All's he was is the arresting officer; was he going to let me go?"

During her closing argument, the prosecutor asserted that petitioner had "manipulated" the case from the beginning, including by failing to give his version of the events to the police at an earlier time. She argued, without objection from defense counsel:

"[Petitioner] has a motive to tell you that it just didn't happen the way it happened. The motive's obvious. What's interesting is, is that he's had access to all the police reports, the video, the statements; he's had access to all of the testimony before he chose to testify.

"Law enforcement never heard his side. You'd think that if a trial of this magnitude was waiting for a year and a half, and you had an explanation that would prevent it from getting here, you would give it to law enforcement. Even a self-serving explanation. You would write it out at least. And why didn't that happen even? Because, a detective can take that and go to the witnesses and say, 'Is this right, is this right, did this detail happen right?' [Petitioner] didn't even do that because he wanted to wait until all was said and done before he could manufacture, for you folks, his side of the story."

The prosecutor also used the discrepancy between JJ's trial testimony and her earlier interview as evidence of petitioner's "manipulation" of the case. The prosecutor told the jury that, between the time of JJ's initial interview and trial, she had been pressured to recant and coached by petitioner and his attorney, as well as her family. The prosecutor explained that the "final manipulation" came on the night before trial, when defense counsel and JJ's father

(petitioner's half-brother) took her to dinner and explained what would happen to petitioner if he were convicted. The prosecutor then argued:

> "Ultimately it was not successful though. In her testimony she tried in vain to take back what she said, but ultimately she kept having to concede, 'Yes, that is what I told [Detective] Davidson.' Finally, when she was just breaking down and it was really a sad thing to see, remember her very last statement from the stand? *'It's in the police report, what it says in the police report.'*"

(Emphasis added.)

In his closing argument, defense counsel chose to focus on the state's burden of proof, offering the metaphor of paddling a canoe from lake to lake, one lake representing freedom and the other, conviction. In the stream between the lakes, he argued, was an impasse of rocks—reasonable doubt. "All of those rocks," he argued, "every one of those rocks, those large rocks of reasonable doubt must be removed before that canoe can make it to the lake of conviction." Defense counsel then attempted to explain why it was reasonable for JJ to change her story, but he did not directly address the prosecutor's use of JJ's "last statement" on the stand—*i.e.*, "It's in the police report, what it says in the police report."

In rebuttal, the prosecutor seized on defense counsel's lake metaphor. She began by stating, "If you find [petitioner] not guilty, you will end up back in the lake that he came from, and that's the lake of drowning girls." She soon returned to the subject of JJ's testimony, stating:

> "Defense counsel never counters the statements made by [JJ] originally to [the detective] that she saw her uncle touch [AG]'s breasts repeatedly. Never counters that; [JJ] is your eyewitness. What she reported to [the detective] on the 9th and *what she finally conceded as her last statement under oath in here is, 'What I said is in the police report.' She finally came back around and had to concede that what she said at the time is what happened.*"

(Emphasis added.) When discussing the first-degree sexual abuse charges, the prosecutor referred to the "undisputed evidence from [JJ] telling [Detective] Davidson, 'I saw this

repeated contact with her breasts, I was an eyewitness, and it was intentional.'" The prosecutor later closed her rebuttal as follows:

"I'm going to ask you to find [petitioner] guilty of each and every one of these charges, because to not do so, as [defense counsel said], would return him to the lake. *The lake where [JJ] still lives, and where girls are given alcohol and taken advantage of sexually, at least one that we know of.*

"Thank you."

(Emphasis added.) Defense counsel did not object to that or any other of the prosecutor's statements during rebuttal.

After lengthy deliberations, the jury ultimately found petitioner guilty of attempted first-degree rape, two counts of first-degree sexual abuse, and three counts of furnishing alcohol to a minor, and he was sentenced to 75 months in prison.[1] Petitioner appealed, this court affirmed without opinion, and the Supreme Court denied review. *State v. Grant*, 237 Or App 690, 243 P3d 159 (2010), *rev den*, 349 Or 602 (2011).

Petitioner then filed a petition for post-conviction relief in which he alleged that his trial counsel had provided constitutionally inadequate assistance in the following respects:

"Trial counsel failed to object to improper statements of the prosecutor during her closing argument and failed to move for a mistrial. The prosecutor made arguments that misrepresented the facts of the case. She also commented on the petitioner's right to remain silent and argued that guilt could be inferred from the exercise of those rights.[2] The prosecutor also urged the jury to convict the petitioner

---

[1] The jury did not reach a verdict on one count of second-degree unlawful penetration.

[2] Petitioner separately alleged that trial counsel should have objected to questions drawing attention to petitioner's right to remain silent and right to counsel. That paragraph of the petition alleged that "[t]rial counsel failed to object to questions during the trial drawing attention to the defendant's invocation of his right to remain silent. He also drew further attention to the matter by offering evidence that the defendant had invoked his right to counsel. Commenting on a criminal defendant's invocation of his constitutional rights in front of a jury is inherently prejudicial."

out of concern for other girls if [petitioner] was not sent to prison. Each of her comments was improper. The petitioner was prejudiced by each one of the comments inflaming the jury."

At the post-conviction trial, the state[3] offered an affidavit from petitioner's trial counsel that explained his trial strategy and emphasized the downside to requesting a mistrial under the circumstances of the case. With regard to petitioner's invocation of his rights to remain silent and to an attorney, trial counsel explained that petitioner's "unprompted" testimony had waded into that area, and "once petitioner introduced that topic, and the jury knew that he got a lawyer to assist him in communications with law enforcement or DHS, I felt it would be helpful to establish that he had never talked with DHS or law enforcement despite the fact that they could have talked with him if they wanted to get his side of the story." Counsel further averred that, "[d]uring the trial, I was aware of several opportunities in which I may have objected and requested a mistrial which may or may not have resulted in the Court granting a mistrial," but that, tactically, he elected not to request a mistrial "after several days of trial with a jury that appeared to be receptive and comfortable with [petitioner]. Although one could never tell what a jury is thinking, both [petitioner] and I felt good about this jury." Finally, with respect to the prosecutor's closing argument, counsel stated that he was aware that she had misstated facts and that she was "making strong statements about my manipulation of the evidence," but that he had decided, as a tactical matter, "that the district attorney was alienating the jury with this harsh language" and that his client would be better served by not objecting.

After taking the matter under advisement, the post-conviction court denied the petition. In the judgment, the post-conviction court stated that the prosecutor's "use of 'drowning girls' was certainly inartful but not suffic[ient] for mistrial" and "not egregious enough" to prejudice petitioner; that trial counsel made a reasonable strategic

---

[3] We refer to defendant, the superintendent of the correctional facility where petitioner is incarcerated, as "the state."

decision to address petitioner's pretrial silence in the way that he did; that the "jury [was] instructed that closings [were] not evidence" and that the prosecutor's closing was "within bounds"; and, in summation, that petitioner had produced "insuff[icient] evidence of inadeq[uacy], insuff[icient] evid[ence] of prejud[ice]." Petitioner now appeals that judgment.

## II. STANDARD OF REVIEW AND APPLICABLE PRINCIPLES

Under Article I, section 11, of the Oregon Constitution, a criminal defendant has a right to a lawyer who provides adequate assistance. A petitioner seeking post-conviction relief based on inadequate assistance of counsel "must demonstrate two things: that his trial counsel failed to exercise reasonable professional skill and judgment and that he suffered prejudice as a result." *Gable v. State of Oregon*, 353 Or 750, 758, 305 P3d 85 (2013) (citing *Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002)). Thus, "even if petitioner proves that his trial counsel failed to exercise reasonable professional skill and judgment, he still must prove that he suffered prejudice as a result of that failure." *Id.* A criminal defendant also has a right to effective assistance of counsel under the Sixth Amendment to the United States Constitution. Under federal law, a petitioner must establish that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 US 668, 687, 104 S Ct 2052, 80 L Ed 2d 674 (1984).

In assessing counsel's exercise of skill and judgment, we "make every effort to evaluate a lawyer's conduct from the lawyer's perspective at the time, without the distorting effects of hindsight." *Lichau*, 333 Or at 360. That is, we will not "second-guess a lawyer's tactical decisions in the name of the constitution unless those decisions reflect an absence or suspension of professional skill and judgment." *Gorham v. Thompson*, 332 Or 560, 567, 34 P3d 161 (2001); *see Krummacher v. Gierloff*, 290 Or 867, 875, 627 P2d 458 (1981) ("The constitution gives no defendant the right to a perfect defense—seldom does a lawyer walk away from a trial without thinking of something that might have been done differently or that he would have preferred to have

avoided."). "When, as in this case, the state argues that the petitioner's trial counsel made a reasonable tactical choice, that argument does not shift the burden of production and proof; rather, * * * the burden of production and proof remains with [the petitioner]." *Pereida-Alba v. Coursey*, 356 Or 654, 662, 342 P3d 70 (2015).

As noted, a petitioner must also demonstrate that he was prejudiced by trial counsel's mistake. *See Gable*, 353 Or at 758. "The legal standard that applies to the prejudice prong entails demonstrating that, based on the facts that the petitioner has established by a preponderance of the evidence, the acts or omissions of counsel 'had a tendency to affect the result of the trial.'" *Id.* at 759 (quoting *Burdge v. Palmateer*, 338 Or 490, 492, 112 P3d 320 (2005) (internal citations omitted)). *See Green v. Franke*, 357 Or 301, 322, 350 P3d 188 (2015) ("[W]here the effect of inadequate assistance of counsel on the outcome of a jury trial is at issue, it is inappropriate to use a 'probability' standard for assessing prejudice. Instead, because many different factors can affect the outcome of a jury trial, in that setting, the tendency to affect the outcome standard demands more than mere possibility, but less than probability.").

In reviewing the post-conviction court's determinations concerning adequate performance and prejudice, our review "is not open-ended. We review such proceedings for errors of law," and a "post-conviction court's findings of historical fact are binding on this court if there is evidence in the record to support them." *Green*, 357 Or at 312.

## III.   ANALYSIS

On appeal, petitioner again argues that an attorney exercising reasonable professional skill and judgment would have (1) objected or moved for a mistrial at various times during the prosecutor's closing argument, and (2) handled petitioner's invocation of his constitutional rights differently— both by not broaching the subject in the first place, and by objecting once the prosecutor began to address those issues.

### A.   *Closing Argument*

According to petitioner, trial counsel's representation during closing argument fell below constitutional

standards because counsel exercising reasonable professional skill and judgment would have (1) objected to the prosecutor's mischaracterization of the evidence; (2) objected to the prosecutor's comments on petitioner's invocation of his constitutional rights; and (3) objected, and moved for a mistrial, on the basis of the prosecutor's suggestion that other girls would be at risk if petitioner were acquitted (*i.e.*, "returning" petitioner "to the lake").

### 1. *Mischaracterization of evidence*

In his post-conviction trial memorandum, petitioner explained that "the prosecutor remarked several times that JJ had admitted during her testimony that her statements to [Detective] Davidson were true," which was "either unsupported or directly contradicted the record." Specifically, petitioner identified the prosecutor's statement during rebuttal that JJ "finally came back around and had to concede that what she said at the time is what happened." That statement, petitioner argued, "plainly mischaracterizes the evidence of a key witness" and "left the jury with the impression that JJ had recanted her trial testimony and acknowledged the first version she told the police was accurate."

On appeal, petitioner again argues that an attorney exercising reasonable professional skill and judgment would have objected to the prosecutor's characterization of the evidence and that trial counsel's affidavit, while explaining his reasons for not moving for a mistrial, does not explain his failure *to object*, which would have alerted the jury to the misstatement and yielded a cautionary instruction with regard to the prosecutor's mischaracterization of the evidence. The state, as it did below, argues that trial counsel's decision to remain silent during closing argument was a reasonable tactical decision and, even if counsel had objected, the outcome of the trial would have been the same.

It is improper for counsel to make factual assertions during closing argument that find no support in the record. *E.g.*, *State v. Rosenbohm*, 237 Or App 646, 649, 241 P3d 344 (2010) ("It is improper for counsel to rely on facts that are not in the record during closing argument."). Normally, however, if the misstatement is brought to the attention of the trial court, "a jury instruction is adequate to cure any prejudice

caused by a prosecutor's misstatement." *State v. Worth*, 231 Or App 69, 75, 218 P3d 166 (2009), *rev den*, 347 Or 718 (2010); *see also Rosenbohm*, 237 Or App at 651 (concluding that the trial court's instructions that "the lawyers' statements were arguments, not evidence" and that the jurors should rely on their own recollections if different from the attorneys, "were adequate to cure any prejudice caused by the prosecutor's misstatement in this case"). *But see State v. Dennis*, 177 Or 73, 132, 159 P2d 838 (1945) ("We have recognized that the conduct of an attorney in going outside of the record may be so reprehensible and so manifestly intended to mislead the jury as to be ground for reversal, even though the court may have attempted to correct the error."); *State v. Treit*, 29 Or App 461, 464-65, 564 P2d 708 (1977) ("Here the state concedes that the prosecutor's remarks went beyond the scope of any admissions made by defense counsel and were not based on the evidence produced at trial but argues that the court's election to admonish the jury to disregard the prosecutor's statement rather than to grant a mistrial was not an abuse of discretion. Several factors convince us to the contrary.").

The preliminary question, then, is whether, during closing arguments, the prosecutor made factual assertions about JJ's testimony that were not supported by the evidence at trial. As mentioned, petitioner argues that the prosecutor inaccurately and repeatedly told the jury that JJ had conceded at trial that her original statements to the interviewing detective were true.[4] Most saliently, petitioner points to (1) the prosecutor's suggestion during closing argument that JJ conceded, *"It's in the police report, what it says in the police report,"* and (2) the prosecutor's statement during rebuttal that JJ "finally conceded as her last statement under oath in here is, 'What I said is in the police report.' *She finally came back around and had to concede that what she said at the time is what happened."* (Emphasis added.)

Although the prosecutor submitted an affidavit to the effect that her closing and rebuttal statements captured

---

[4] To the extent that petitioner also points to the prosecutor's mischaracterization of JJ's testimony about meeting with defense counsel, we reject that argument without discussion.

the true essence of JJ's testimony, the state does not advance that position on appeal or otherwise defend the accuracy of the prosecutor's characterization of JJ's purported "concession" at trial—and rightfully so. As the previously quoted excerpts of JJ's testimony demonstrate, 277 Or App at 169-70, her last statements under oath concerning the police report were in response to questions about what she *said* to the detectives, not concessions about what *actually happened.* Her testimony at trial was that she had lied to the police, and she did not "concede," as the prosecutor represented to the jury, that "what she said at the time is what happened." The prosecutor's description of JJ's testimony, at least during her rebuttal argument, found no evidentiary support in the record and was subject to objection on that ground.

However, even assuming that adequate counsel would have objected to the prosecutor's mischaracterization of the evidence, we agree with the post-conviction court's conclusion that petitioner has failed to demonstrate any prejudice from counsel's inaction. At the outset of the trial, the trial court repeatedly emphasized to the jurors that they alone were to decide the facts. The pretrial instructions included the following: (1) "You and you alone are the judges of the facts.";
(2) "The opening statements and closing arguments of the lawyers are intended to help you understand the evidence. Although, you should understand that those statements and arguments are not part of the evidence."; (3) "You must not interpret any statement, ruling or remark I make during this trial as any indication that the Court has formed any opinion about the facts or outcome of this case. You and you alone are to decide the facts. You must decide how believable the evidence is and what weight or value you will give that evidence."; and (4) "At the end of the trial you will have to make your decisions based upon what you recall of the evidence." The jurors were allowed to take notes and instructed to "pay close attention to the testimony as it is given."

Just before closing arguments, the trial court again instructed the jury about its responsibility as factfinder. The court instructed:

"As I said earlier, it is your sole responsibility to make all of the decisions about the facts in this case. You must evaluate the evidence to determine how believable that

evidence is. When you make your decisions about the facts, you must then apply the legal rules to those facts to reach your verdict.

"* * * * *

"You are to base your verdict on the evidence and on these instructions. *The lawyer's statements and arguments are not evidence. If your recollection of the evidence is different from theirs, you must rely upon your own memory.*"

(Emphasis added.)

We presume that the jury followed those instructions, unless there was an overwhelming probability that they would have been unable to do so. *See State v. Washington,* 355 Or 612, 660-61, 330 P3d 596, *cert den,* 135 S Ct 685 (2014) (absent an "overwhelming probability that they would have been unable to do so, jurors are presumed to have followed their instructions," including the instruction that "[t]he lawyer's statements and arguments are not evidence"). By the time that the prosecutor mischaracterized JJ's testimony during closing argument, the jury had been repeatedly instructed to pay close attention to the evidence and to rely on its own memory rather than the recollection of the attorneys. As the state points out, an objection to the prosecutor's mischaracterization would have yielded the same instruction that the jury had already heard multiple times. Moreover, JJ's credibility—and, particularly, her change of story—were a focus of the parties' attention from the beginning of the case, and the jury, too, would have been focused on that issue throughout JJ's testimony. (In fact, the "concession" that the prosecutor later mischaracterized had followed questions submitted by the jury itself that were aimed at JJ's credibility.) Given that broader context, we are not persuaded that the prosecutor's mischaracterization of JJ's testimony would have interfered with the ability of the jury to follow its instructions; thus, we agree with the post-conviction court's conclusion that the mischaracterization did not have a tendency to affect the verdict in this case and therefore cannot serve as a basis for post-conviction relief.[5]

---

[5] Our decision should not be read to endorse or condone the prosecutor's misleading remarks; rather, our holding is limited to the question of prejudice under the particular circumstances of this case.

## 2. *Comments on the petitioner's invocation of rights*

Petitioner next argues that his trial counsel provided constitutionally inadequate representation by failing to object during closing argument when the prosecutor commented on his invocation of the right to remain silent and the way that he had "manipulated" the case. However, trial counsel's decisions not to object to those remarks are not the type of tactical choices that we will second-guess. With respect to the prosecutor's comments on petitioner's right to remain silent and to obtain a lawyer, petitioner's counsel made a strategic decision earlier in the trial (which we will later address), and again during closing argument, to use petitioner's invocation of those rights to attack the quality of the state's investigation and to reinforce the strength of petitioner's story. During closing argument, petitioner's counsel contended:

> "Now, I'll comment on one of the facts that the State continues to spend some time on, and that's the fact that [petitioner] wasn't interviewed by the police. [Petitioner] didn't talk to the police. Now, I want to remind you that there is an exhibit, and it's State's Exhibit 103, which is a letter from my office, a letter that was sent to DHS, a letter that Detective Davidson acknowledged that he received. And what you're going to get in evidence is both the letter and the fax confirmation that came.

> "This is a letter dated January 22nd. * * * I want you to focus on that last sentence [of the letter]. 'If you desire to contact [petitioner], please contact my office, and I'll arrange for that opportunity.'

> "Detective Davidson was clear; he never contacted my office. No one from the State ever contacted my office. * * * The State should have at least, with their burden of proof, investigated further.

> "The State seems to suggest in—in their examination of [petitioner] that perhaps if the State had contacted [petitioner] and heard his story, we wouldn't be here today. *That suggests that the State acknowledges there's reasonable doubt here.*"

(Emphasis added.)

Thus, counsel did not sit idly while the prosecutor exploited petitioner's invocation of his constitutional rights. Rather, he tried to use that same evidence to petitioner's advantage. The strategy, while unsuccessful in hindsight, does not reflect the absence or suspension of professional skill and judgment. *See Pachl v. Zenon*, 145 Or App 350, 360, 929 P2d 1088 (1996), *rev den*, 325 Or 621 (1997) ("It is not an error of constitutional magnitude to choose a trial tactic that is not successful, and this is the kind of case on which reasonable minds could differ as to the appropriate legal strategy.").

As for the prosecutor's suggestions that petitioner (and his counsel) had "manipulated" the case, trial counsel's affidavit demonstrates that he exercised professional skill and judgment in deciding not to object or seek a mistrial based on the prosecutor's "harsh language." Counsel averred that he "felt that those statements and claims of manipulation were not resonating with the jury," and that he "felt that the district attorney was alienating the jury with this harsh language. Because I believed that the prosecutor was hanging herself by continuing with this language, I did not object to it." While that decision might not have been the best approach in hindsight, it was not an unreasonable approach. *Krummacher*, 290 Or at 875. Assuming that the prosecutor's remarks crossed into impermissible territory, they nonetheless were not so inflammatory that counsel's strategic decision to remain silent represented an absence or suspension of professional skill and judgment.

### 3. *Reference to "returning" petitioner "to the lake"*

Petitioner also argues that it was unreasonable for counsel not to object when the prosecutor stated that an acquittal "would return [petitioner] to the lake. The lake where [JJ] still lives, and where girls are given alcohol and taken advantage of sexually, at least one that we know of." According to petitioner, that statement, which improperly suggested that he would reoffend, was "too inflammatory to ignore," and "[t]he only way, therefore, to address the improper statement was to object."

The inflammatory effect of the prosecutor's argument—and, hence, trial counsel's obligation to object—must be viewed in the context of the overall case against petitioner. The prosecutor's reference to returning petitioner "to the lake" came in response to petitioner's counsel's own metaphor about reasonable doubt and the obstacles that had to be overcome to reach the "lake of conviction." It also occurred in the context of a closing argument that, in counsel's view, was "turning the jury against [the prosecutor]" and was alienating a jury that "appeared to be receptive and comfortable with [petitioner.]" Although there may be circumstances in which a prosecutor's statements are so inflammatory or otherwise prejudicial that no reasonable attorney would simply rest on the hope of an alienated jury, petitioner has not carried his burden to demonstrate that this is such a case. Given the totality of the circumstances, and counsel's overall strategy during closing argument, it was reasonable for trial counsel to not object to the prosecutor's remark about "returning" petitioner "to the lake." *See Pereida-Alba*, 356 Or at 674 (explaining that counsel's failure, and whether that failure constitutes inadequate assistance of counsel, must be "considered in light of the strategy that the court finds petitioner's counsel did pursue").

B.  *Handling of Petitioner's Testimony Regarding Constitutional Rights*

In his final argument, petitioner contends that, in addition to failing to object when the issue arose during closing arguments, his counsel also provided constitutionally inadequate assistance during petitioner's testimony with regard to his invocation of his right to silence and right to an attorney. According to petitioner, his counsel fell below constitutional standards in two respects: first, by raising that issue in petitioner's direct testimony; and, second, by "fail[ing] to object to the prosecutor's inappropriate questions."

Neither of those contentions is availing. As for the first issue, trial counsel's affidavit, which the post-conviction court credited, states that petitioner himself raised his invocation of constitutional rights "unprompted"—and the

transcript bears that out as well.[6] As for the second, we hold that trial counsel made a reasonable strategic decision under the circumstances. In his affidavit, trial counsel explained:

> "However once petitioner introduced that topic, and the jury knew that he got a lawyer to assist him in communications with law enforcement or DHS, I felt it would be helpful to establish that he had never talked with DHS or law enforcement, despite the fact that they could have talked with him if they wanted to get his side of the story. I knew that I had a letter I had written to DHS that instructed them they could talk to petitioner if they wanted to. That was made available to law enforcement, too. Law enforcement would have known that they also could talk to petitioner if they arranged it through me.

> "I do not remember if I intended to introduce that exhibit without petitioner's unprompted statements, but I know that I did have it available as an exhibit prior to trial, which suggests that I felt it would be helpful at trial.

> "My questions, and the exhibit, were designed to show that law enforcement was too narrow in their investigation and did not take the opportunity they had to get my client's version of the events. I believed that would be helpful to show the jury that the investigation, and the state, was biased."

(Paragraph numbering omitted.)

As we have already held with regard to trial counsel's closing argument on the subject, in these circumstances we will not second-guess counsel's use of petitioner's invocation of his right to silence and right to an attorney. Those tactical decisions, though ultimately unsuccessful, do not demonstrate an absence or suspension of professional skill or judgment.

## IV. CONCLUSION

For the foregoing reasons, we agree with the post-conviction court's ruling that petitioner failed to establish

---

[6] Counsel's affidavit states that petitioner "testified to a conversation he had with his sister about talking with DHS or not talking with DHS, and that his sister told him that he needed to talk to a lawyer. I do not remember that this was something I intended to elicit through questioning, and the question I asked was not designed to get the response he gave." The corresponding trial testimony is set out above at 277 Or App at 170-71.

both requirements—that his trial counsel failed to exercise reasonable professional skill and judgment and that he suffered prejudice as a result—with regard to any of the allegations in his petition. Accordingly, we affirm the judgment of the post-conviction court denying his petition.

Affirmed.