Argued and submitted January 31, reversed and remanded August 21, 2013

KEVIN RICHARD BERG,
*Petitioner-Appellant,*

*v.*

Mark NOOTH,
Superintendent,
Snake River Correctional Institution,
*Defendant-Respondent.*

Malheur County Circuit Court
10068144P; A150012

309 P3d 164

Dennis N. Balske argued the cause and filed the briefs for appellant.

Jeremy C. Rice, Assistant Attorney General, argued the cause for respondent. With him on the brief were Mary H. Williams, Deputy Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

Petitioner brought this action for post-conviction relief after having been convicted of numerous sexual and other offenses against his two daughters. Petitioner alleged that his trial counsel had provided inadequate assistance by, among other things, failing to object to testimony and prosecutorial arguments vouching for the victims' credibility. The post-conviction court denied relief, and petitioner appeals. We conclude that trial counsel's performance was constitutionally deficient and that petitioner's defense was prejudiced as a result. Accordingly, we reverse and remand.

The charges against petitioner stemmed from allegations by his daughters, H and A, that he had sexually abused them for a number of years. Those allegations arose in 2004, but that was not the first time that the girls had claimed abuse by petitioner. In 1997, A told H that petitioner had sexually abused her, and H relayed the allegation to the girls' grandmother. An investigation ensued, and both girls later denied having been touched inappropriately. Petitioner evidently was not charged with any crimes at that time.

In March 2004, when she was 15 years old, H told Deputy Sheriff Charles Pore that petitioner had been sexually abusing her. Pore took H to the police station, where he and a Department of Human Services (DHS) caseworker, Jeanette Grant, interviewed her. H told them that the petitioner had abused her many times in different locations in their home as well as in a shop behind the house. She stated that, in the shop, petitioner frequently undressed her from the waist down, made her sit on a cloth rag on a workbench, and rubbed his penis between her thighs until he ejaculated. According to H, she and petitioner would then clean up with other rags, which they would throw into the wood stove.

After the interview concluded, Pore went to petitioner's house to search for the rags that H had described. Petitioner was not home, but his wife, Lenice Berg (the girls' mother),[1] consented to a search of the premises. Pore seized several rags from the shop. Pore intended to continue

---

[1] We refer to the girl's mother as "Lenice" to avoid confusion with petitioner, who has the same last name.

searching the shop, but petitioner returned to the premises. When Pore told petitioner about H's allegations, petitioner initially told him to stop searching. After Pore called the district attorney to request a search warrant, petitioner relented and allowed the search to continue.

DHS placed both girls in foster care that day. H was later taken to CARES, a child-abuse assessment facility, where she was interviewed and given a physical examination. A, who was then age 12, initially denied that petitioner had abused either girl. However, two months later, she asserted that petitioner had been abusing her. She was also examined and interviewed at CARES.

The morning after H made the initial disclosure, Lenice awoke to find petitioner drinking alcohol, which she had never seen him do in the morning. According to Lenice, petitioner "looked like he'd just lost it" and was "acting really weird." Petitioner put a gun in his pickup and was about to drive away, so Lenice jumped into the truck with him. Petitioner drove around for some time and talked incoherently, saying, for example, that he had seen a black panther. Lenice eventually called 9-1-1 and told the dispatcher where they were, and Pore and another police officer later found them. Pore approached petitioner and asked what was going on. Petitioner told him, "God told me to come home." When Pore asked why, petitioner said, "Because I did bad things to my girls."

Pore later sent the rags that he had seized from petitioner's shop to an Oregon State Police crime lab. Three of the rags tested positive for seminal fluid and were then subjected to DNA testing. Petitioner's DNA was found on all three rags, and H's DNA was found on two of them. The third rag included a "minor profile" that was inconclusive. The testing did not reveal whether the DNA on the rags was the result of sexual conduct or whether petitioner's and H's DNA had gotten on the rags at the same time.

Petitioner was eventually charged with 33 offenses in three separate indictments. One indictment alleged one count of first-degree rape, seven counts of first-degree sodomy, one count of coercion, and 11 counts of third-degree sexual abuse, all relating to H's allegations of sexual offenses.

The second indictment alleged one count of first-degree sodomy and seven counts of first-degree sexual abuse related to A's sex-offense allegations. The third indictment alleged one count each of criminal mistreatment, fourth-degree assault, and strangulation, as well as two counts of harassment, all stemming from an incident in which the girls alleged that petitioner had kicked H and then blocked A's mouth and nose with his hand, preventing her from breathing.

At petitioner's criminal trial, both parties called a number of witnesses. Only some of the witnesses' testimony is material to the issues that we address in this opinion, and we recount only that testimony here. Both H and A testified in the state's case-in-chief, describing multiple acts of sexual abuse and other violence by petitioner. One aspect of H's testimony is particularly pertinent to petitioner's claims. On cross-examination, trial counsel noted that H had said during her CARES interview that she had told her mother that petitioner was abusing her. Trial counsel asked H whether that was true, and she affirmed that she had told her mother about the abuse. Trial counsel then pointed out that, at a jurisdictional hearing related to the girls' placement in foster care, H had testified that she had never told her mother. H admitted that she had lied under oath at that hearing because she did not like living with her foster family and "wanted to go home."

The state also called Dr. Jamie Purvis, who had conducted the physical examination of both girls at CARES. Purvis was the medical director of CARES, had extensive training in diagnosis and treatment of child abuse, and had worked at CARES for nine years, during which time she had examined between 450 and 500 children. Purvis testified that, during the examinations of H and A, each girl described numerous sexual acts by petitioner, which Purvis related in her testimony. Purvis also testified that her examination of H revealed two transections of the hymen that could only be explained by "past penetrating trauma."[2]

---

[2] Purvis testified that H had been examined by CARES in 1997 (well before any of the conduct alleged in the criminal cases underlying this case) and that a report from that exam stated that she had a transection that, according to Purvis, showed past penetrating trauma.

In describing H's demeanor during the examination, Purvis stated that the child was "really calm" but that

> "when she talked about what I think she would consider uncomfortable, she became a little bit, she just became really, she just sort of put her head down and would speak really low, so it was difficult to hear her. So, when she talked about the incidents that occurred, her demeanor changed and that would be really consistent with what she was talking about."

Based on her physical findings as well as H's medical history and her statements, Purvis diagnosed H as having been sexually abused.

Purvis testified that her examination of A also revealed two hymenal transections that were less extensive than H's and therefore were "more concerning than they were diagnostic." She described A's demeanor during the examination as "sort of sullen when she talked about what happened," but otherwise "pretty normal." Purvis stated that she had diagnosed A as having been sexually abused based on the physical findings as well as A's statements and history.

Petitioner was represented by counsel at the criminal trial. While cross-examining Purvis, petitioner's trial counsel asked about the various factors that contributed to the diagnoses, and the following exchange took place:

"Q Do you do anything to ascertain any other information about these disclosures? Like, other than what the child has said?

"A Well, there's a lot of literature about how children disclose and what they say and there's a number of, sort of diagnostic criteria that we go through to determine what the disclosures, whether they're, what the veracity is, um.

"Q Let me, I'm sorry to interrupt you, doctor. I asked a poor question or you didn't hear me, I'm sorry.

"A Okay.

"Q I'm asking not about what you believe, if you believe somebody's telling you the truth, I'm asking you, did you go outside of what these children told you, to ascertain whether any of this information was correct in any other fashion? Before you reached your diagnosis?"

Purvis explained that she had discussed the allegations with Pore and Grant, had taken a "history," and had looked at medical records that CARES had from earlier examinations.

The state also called Robin DeLong, who had interviewed both H and A at CARES. DeLong was the lead interviewer at CARES and a coauthor of the Oregon Interviewing Guidelines, a manual on standards and practices for interviewing children. She stated that forensic interviewing was "an area of expertise and specialties" and that forensic child interviewing was a subspecialty within the field. During her testimony, the state played for the jury video recordings of her interviews with H and A, during which they evidently again described sexual acts by petitioner.[3]

Psychologist Susan Dragovich also testified in the state's case. Dragovich, whom DHS had hired in connection with its efforts to remove H and A from petitioner's home, testified that she had interviewed both girls to evaluate their need for treatment. Trial counsel objected to Dragovich rendering an opinion on sexual abuse. Outside the jury's presence, Dragovich stated that she had diagnosed H with "sexual, physical and emotional abuse of a child * * *; post traumatic stress disorder * * *; [and a] major depressive disorder * * * at severe levels." After further questioning and discussion, the court ruled that Dragovich could not reveal her sexual-abuse diagnosis to the jury but that she could testify that the girls' post-traumatic stress disorder was related to being victims of sexual, physical, and emotional abuse, which she did.

In the defense case-in-chief, part of trial counsel's strategy was to portray DHS, CARES, and the police as part of a system that accepts children's allegations of sexual abuse unquestioningly. To that end, trial counsel called Grant, the DHS caseworker, to testify. His questions included the following:

"Q   And your agency takes the position that if the, you believe the children no matter what, don't you?

"A   No, that's not true.

---

[3] The video recordings, which were not transcribed, are not part of the post-conviction record.

"Q    You did in this case, didn't you?

"A    I did believe the children in this case."

The prosecutor objected and, outside the presence of the jury, argued that trial counsel was calling on Grant to comment on whether or not she believed the allegations. Trial counsel offered to rephrase the question, but the prosecutor and the court both observed that Grant had already answered. The court asked trial counsel whether he wanted the court to instruct the jury to disregard the answer. Trial counsel never responded, and the testimony stood.

Petitioner testified in his own defense and denied that he ever had abused H or A. Lenice also testified and stated that, after H told her grandmother in 1997 that petitioner had abused A, both girls repeatedly told Lenice that nothing had happened. Lenice also testified that, during the 1997 investigation, petitioner was not allowed to live in the family home and that, after the associated juvenile jurisdictional case was dismissed, he returned, and the girls were "really happy" and "very, very excited" to see him. Lenice denied that the girls had ever accused petitioner of abusing them after that. However, she testified that, as the girls got older, they became increasingly "mouthy, defiant," and disrespectful, sometimes calling her foul names and hitting her.

In closing arguments, the prosecutor referred to the testimony of DeLong, Purvis, and Dragovich, highlighting their expertise and experience, and stated, "So those are three experts that talked to and came to the same conclusion after reviewing the medical information, the report information from talking with these girls." Later, during his rebuttal argument, the prosecutor stated that the defense needed the jury to believe

"that these girls are so good at [lying] that they fooled Chuck Pore, they fooled Jeannette Grant, they fooled Robin [DeLong], they fooled Dr. Purvis, and they fooled Dr. Dragovich. That all these people who have done this for a living couldn't see through it. These girls were just rock solid good, had that lie down good and tricked them all."

Later in his rebuttal, the prosecutor again highlighted the expertise of the state's witnesses: "And finally, again, you have the professionals, everybody's reputation. Chuck [Pore], Jeannette [Grant], Robin [DeLong], Dr. Purvis, Dr. Dragovich. They're all going to say, they'll all either diagnose or find sex abuse. Professionals and doctors."

The prosecutor made additional statements in his closing argument that are pertinent to this post-conviction case. At one point, he asserted that the girls had a number of disincentives to lie about abuse, including being put in foster care and having to "testify in front of the person that's abusing you." He repeatedly emphasized that the jurors needed to determine whether H and A were credible, asserting that "that's what [this] case is pretty much coming down to. It's going to come down to who it is that you believe. Do you believe the girls when they tell you what happened, or do you believe [petitioner]?" Referring to petitioner, the prosecutor stated, "He got away with it once in 1997, I'm asking you to not let him get away with it again. I'm asking you to return a verdict of guilty on all counts and to let this horror finally come to an end."

Trial counsel did not object to any of those arguments.

The jury returned a mixed verdict. It unanimously found petitioner guilty of eight counts involving H (one count each of rape, sodomy, and coercion, and five counts of sexual abuse). By a vote of 11 to 1, the jury found petitioner guilty of another count of sodomy involving H and one count of harassment in connection with A. By a vote of 10 to 2, it found him guilty of nine counts involving H (criminal mistreatment, assault, four counts of sodomy, and three counts of sexual abuse) and five counts involving A (sodomy and four counts of sexual abuse). The jury acquitted petitioner of strangulation, one count of sodomy involving H, three counts of sexual abuse involving H, and one count of sexual abuse involving A. The jury returned invalid verdicts on the three remaining counts (harassment involving H and two counts of sexual abuse involving A); the court dismissed those charges at the prosecutor's request. The court sentenced petitioner to a total of 450 months in prison.

Petitioner later brought this action for post-conviction relief, alleging that trial counsel had provided constitutionally inadequate assistance. Among other things, petitioner alleged that trial counsel had failed to protect him from Purvis's and Grant's testimony vouching for H's and A's credibility. He also alleged that trial counsel had failed to protect him from improper comments by the prosecutor during closing arguments, including his emphasis of Purvis's and Grant's vouching testimony, comments suggesting that he personally believed in the truth of the allegations, and comments about petitioner's initial refusal to consent to the search of his property.

In support of his claims, petitioner submitted an affidavit from trial counsel. In that affidavit, trial counsel acknowledged that he had elicited Grant's testimony that she believed the girls' allegations against petitioner and that he had not taken any steps to protect petitioner from that testimony:

> "I did not move to strike the testimony, and I did not request a curative instruction, despite the trial court's suggestion that I might want the court to instruct the jury to disregard the prejudicial testimony. I should not have elicited the witness's personal opinion in the truthfulness of the allegations. Once I did, I should have heeded the court's suggestion and had the jury instructed to disregard this vouching testimony."

Trial counsel also stated that he believed that Purvis had vouched for H's credibility when she testified that there are diagnostic criteria that are used to determine the veracity of children's disclosures. In trial counsel's view, he should have moved to strike the testimony and sought a curative instruction, which he did not do. Trial counsel further averred that he should have objected to the prosecutor's argument that the defense needed the jury to believe that H and A had "fooled" Pore, Grant, Purvis, DeLong, and Dragovich, as well as the prosecutor's reference to those professionals' reputations.

The post-conviction court denied relief. With respect to Grant's testimony, the court concluded that petitioner was not prejudiced by Grant's statement that she believed the reports by H and A. The court noted that trial counsel's

question that elicited that testimony was "one question in 9 days of testimony" and that it was "[n]o surprise that DHS believed the victims, since they put the children in foster care and had supervised visitation." The court also concluded that, although the prosecutor had improperly given his personal opinion about petitioner's guilt during closing arguments, trial counsel's failure to object was not prejudicial because the prosecutor's comment would not have warranted a mistrial, and the most that trial counsel could have obtained by objecting was "the usual instruction" that closing arguments are not evidence. The court found that, "[o]ther than that comment, there was no vouching."

On appeal, petitioner renews his contention that trial counsel failed to protect him from improper vouching by witnesses and failed to object to the prosecutor's vouching and other allegedly improper comments. Petitioner's claims are rooted in Article I, section 11, of the Oregon Constitution, which guarantees criminal defendants the right to adequate assistance of counsel.[4] To be entitled to post-conviction relief, petitioner was required to prove that trial counsel had failed to exercise reasonable professional skill and judgment and that petitioner had suffered prejudice as a result. *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991). "In reviewing a claim of ineffective assistance of counsel, we are bound by the post-conviction court's factual findings that are supported by evidence in the record; we make our own determination regarding constitutional issues." *Saldana-Ramirez v. State of Oregon*, 255 Or App 602, 603, 298 P3d 59 (2013).

We begin and end with petitioner's assertion that trial counsel rendered inadequate assistance by failing to protect petitioner from testimony and argument that improperly vouched for H's and A's credibility.[5] We have little difficulty concluding that trial counsel failed to exercise reasonable professional skill and judgment, given the Supreme Court's emphatic condemnation of allowing one witness to vouch for another.

---

[4] Petitioner also asserted in his petition for post-conviction relief that he was denied effective assistance of counsel under the Sixth Amendment to the United States Constitution. Because we conclude that petitioner is entitled to relief under the Oregon Constitution, we do not address his federal claim.

[5] Petitioner makes other claims of inadequate assistance of trial counsel that we do not reach, given our determination that his claims related to counsel's failure to object to vouching are dispositive.

In *State v. Middleton*, 294 Or 427, 433, 657 P2d 1215 (1983), the court considered the testimony of a social worker who stated that the behavior of the victim in that case, who had recanted her initial allegation that the defendant had raped her, was characteristic of sexually abused children. The court held that "it is not error to allow testimony describing the reaction of the typical child victim of familial sexual abuse and whether a testifying victim impeached by her prior inconsistent statement reacted in the typical manner when she made that inconsistent statement." *Id.* at 438. However, the court "recognize[d] that jurors could be so impressed by the 'aura of reliability' of expert testimony that they might trust it more than their own perceptions," *id.* at 437, and it expressly held that "in Oregon a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth. We reject testimony from a witness about the credibility of another witness." *Id.* at 438.

The court reaffirmed its rejection of vouching testimony in *State v. Milbradt*, 305 Or 621, 756 P2d 620 (1988). In that case, two mentally disabled women alleged that the defendant had sexually abused them. A psychologist testified, over the defendant's objection, that he had interviewed the women and had "found no evidence of deception and that what they were reporting represented their experience." *Id.* at 625. The trial court allowed the testimony but instructed the jury that it alone had to determine whether the victims had fabricated their stories and that the opinion of an expert "'cannot be substituted for that obligation of the jurors.'" *Id.* at 627-28.

The Supreme Court held that the defendant's objection should have been sustained:

> "We have said before, and we will say it again, but this time with emphasis—we really mean it—*no psychotherapist may render an opinion on whether a witness is credible in any trial conducted in this state*. The assessment of credibility is for the trier of fact and not for psychotherapists."

*Id.* at 629 (emphasis in original). The court added that an "opinion that a person is not deceptive, could not lie without being tripped up, and would not betray a friend (to wit: the

defendant) is tantamount to" an opinion that a witness is telling the truth. *Id.* at 630. The court also commented on the instruction that the trial court had given:

> "Although we do not hold that any form of instruction necessarily would have been sufficient, the instruction by the trial judge in this case was insufficient in that the judge failed to tell the jury to disregard totally the testimony of [the psychologist]. We suggest in the future that if counsel attempts to elicit similar testimony the trial judge, *sua sponte*, should summarily cut off the inquiry before a jury is contaminated by it. The admission of the testimony constituted prejudicial error and was not 'cured' by the instruction."

*Id.*

In this case, petitioner asserts that Purvis and Grant impermissibly vouched for H's and A's credibility in their testimony and that the prosecutor also did so in his closing arguments. Petitioner further contends that the prosecutor impermissibly highlighted that and other vouching when he argued that H and A could not have fooled Pore, Grant, DeLong, Purvis, and Dragovich, and urged the jury not to conclude that the girls were such good liars that "all these people who have done this for a living couldn't see through it." Petitioner argues that trial counsel should have objected to that evidence and argument. We need not address whether trial counsel should have objected to Purvis's testimony, because we conclude that he failed to exercise reasonable professional skill and judgment with respect to Grant's testimony and the prosecutor's closing arguments.

At the criminal trial, petitioner's counsel adopted a strategy of attempting to show that the "system" automatically believes children's allegations of sexual abuse. In conjunction with that strategy, trial counsel first asked Grant whether DHS always believes children who report abuse, "no matter what." When she responded, "that's not true," counsel asked, "You did in this case, didn't you?" Grant then stated that she "did believe the children in this case." Following an objection from the prosecutor, the trial court offered to instruct the jury to disregard Grant's statement, but counsel did not follow up on that offer.

We do not second guess the reasonableness of trial counsel's overall strategy of attempting to undermine the integrity and objectivity of the government's investigation. However, such a strategy can be pursued without allowing witnesses to testify that they believe certain statements made by people who allegedly are victims of sexual abuse. And we cannot ignore the Supreme Court's view that such vouching testimony is so prejudicial that trial judges, *"sua sponte,* should summarily cut off the inquiry before a jury is contaminated by it." *Id.*; *see also State v. Lupoli,* 348 Or 346, 366 n 11, 234 P3d 117 (2010) (where the children's credibility "was paramount" in a child sex abuse case, error in admitting expert "vouching" testimony was not harmless); *State v. Southard,* 347 Or 127, 141, 218 P3d 104 (2009) (where a diagnosis of sexual abuse turns primarily on a credibility determination, in the absence of physical evidence, the diagnosis is inadmissible as a matter of law because "the risk of prejudice substantially outweighs the minimal probative value"). The holdings in *Milbradt, Lupoli,* and *Southard* suggest that it will be the rare case in which reasonable trial strategy will include allowing witnesses—particularly those with pertinent expertise—to vouch for the credibility of people who report sexual abuse.

This is not such a case. The record reveals no way in which petitioner's defense could have benefitted from having Grant aver that she believed H and A. As trial counsel opined in an affidavit he submitted in the post-conviction proceeding, he should not have asked Grant whether she believed the children in this case and, once Grant stated that she did believe them, he should have accepted the court's offer to instruct the jury to disregard the answer. Both the question and the failure to request the instruction constituted failures of reasonable professional skill and judgment.

Moreover, a defense lawyer exercising reasonable professional judgment would have objected to those portions of the state's closing argument in which it emphasized that several people with specialized expertise believed the children's stories of abuse. As noted, the state argued that H and A could not have "fooled" Grant, Pore, DeLong, Purvis, and Dragovich. Given that Grant—an experienced DHS

caseworker with a degree in psychology—had testified explicitly that she believed the children's reports, the prosecutor's argument amounted to a contention that the jurors should believe the children for the simple reason that a person with pertinent expertise had believed them. That argument created a significant risk that the jurors would not make their own credibility determinations, but would "instead defer to the expert's implicit conclusion that the victim's reports of abuse [were] credible." *Southard*, 347 Or at 141. Indeed, that is, essentially, what the prosecutor asked the jurors to do.[6] The prosecutor's argument that the children could not have fooled the other listed witnesses similarly—and impermissibly— urged the jurors to believe the children because other people with expertise (CARES director Purvis, CARES interviewer DeLong, psychologist Dragovich, and Deputy Pore) apparently had believed them. A lawyer exercising reasonable skill and judgment would have objected to that line of argument and taken appropriate protective action, such as requesting a limiting instruction.

We also conclude that trial counsel's failure to object to the testimony and argument described above prejudiced petitioner's defense. The post-conviction court concluded otherwise because (1) trial counsel's question that elicited Grant's statement was only "one question in 9 days of testimony" and (2) it should have come as no surprise that DHS believed the girls, given that it put them in foster care. We respectfully disagree. First, although the question and answer from Grant were only a small part of the evidentiary phase of the trial, the prosecutor twice highlighted Grant's expertise and professional status during closing arguments.

Second, the concern with vouching testimony— particularly testimony from experts—is that jurors will defer to the vouching witness's credibility determinations instead of making those determinations themselves. The

---

[6] *Southard* involved the admissibility of a diagnosis of sexual abuse in the absence of physical evidence of abuse. 347 Or at 142. Here, the children did show physical signs of having been abused. Nonetheless, the principle underlying *Southard* and its progeny applies because nothing in Grant's testimony indicated that she credited the children's reports because they were corroborated by physical evidence; to the contrary, her testimony suggested that she believed the children based on their disclosures.

fact that it may have come as no surprise that DHS believed H and A, given that the agency put them in foster care, does not alleviate that concern. That is, the admission of evidence giving rise to the *inference* that DHS believed the girls does not excuse trial counsel's elicitation of Grant's statement making DHS's view of their credibility *explicit*. The opposite conclusion would have troubling implications: When a criminal defendant is on trial, it would come as no surprise that the police officer who arrested the defendant and the prosecutor who filed the charges believed the witnesses whose reports led to the arrest and charges. Under the post-conviction court's reasoning, there would be no prejudice in allowing police officers to testify, and prosecutors to assert in closing arguments, that they believed those witnesses. That is not permissible.

Moreover, the post-conviction court's prejudice analysis does not take into account the prosecutor's argument that the children could not have "fooled" several of the witnesses whose testimony was based on their own interviews of the children and belief in their statements. That may be attributable to the court's view that no "vouching" occurred during the closing argument other than one comment by the prosecutor regarding his personal opinion. Although no other *explicit* vouching may have occurred, the prosecutor's argument encouraged the jurors to rely on expert belief in the victims' credibility, raising concerns analogous to those underlying holdings in vouching cases like *Lupoli. Cf. Milbradt*, 305 Or at 630 (an opinion that a person "could not lie without being tripped up" amounts to vouching).

In a post-conviction case, prejudice is established if counsel's deficient performance "had a tendency to affect the result." *Gorham v. Thompson*, 332 Or 560, 564, 34 P3d 161 (2001). In petitioner's criminal trial, the witnesses' credibility was critically important. Although the trial was not a pure "swearing match," given that the state introduced the DNA evidence from the shop rags and the physical findings from the CARES examinations, that evidence was directly pertinent to only some of the charges. Moreover, that physical evidence was not conclusive. The persuasiveness of the DNA evidence turned on the credibility of H's testimony explaining how the DNA got on the rags. And although the

results of the CARES examinations are disturbing, H had suffered hymenal trauma long before the acts charged in this case, and the results of A's examination were only "concerning," not necessarily of diagnostic significance. Nor was the vouching evidence rendered insignificant by petitioner's drunken admission that he had done "bad things" to the girls; the trial record contains evidence of much other bad behavior by petitioner that could explain that comment, and the jurors were not bound to consider it as an admission that he had sexually abused his children.

Indeed, the prosecutor did not focus primarily on that other evidence during his closing arguments, but instead stressed the need for the jurors to consider all of the witnesses' testimony—including that of the children and of petitioner—to determine who they believed. The prosecutor asserted that "what [this] case [was] pretty much coming down to" was the jurors' assessment of the children's credibility. "Do you believe the girls when they tell you what happened," he asked at one point, "or do you believe [petitioner]?" Similar themes pervaded the prosecutor's closing and rebuttal arguments.

Petitioner's trial counsel, in turn, attempted to undermine the credibility of the children's testimony and other reports. Trial counsel argued that H and A did not like living with petitioner because he was a harsh taskmaster; he also contended that the girls had fabricated reports of being abused by petitioner because they "wanted to get rid of him." Trial counsel pointed to inconsistencies in the stories that H and A had told over time, in particular H's admission that she had committed perjury at the jurisdictional hearing because she wanted to go home to her mother. Trial counsel suggested that the girls knew how to use the "system" and that, once H made her initial disclosure to Pore, the "system" was geared to believe them regardless of any contradictory evidence.

Although the existence of corroborating physical evidence makes this a closer case with respect to prejudice than many other post-conviction cases, we cannot say that trial counsel's failures had no tendency to affect the verdict. Both the state and petitioner presented this case as one

that turned on the jurors' assessment of the children's credibility.[7] Moreover, the mixed verdict demonstrates that the jury was not completely convinced by H's and A's testimony. In that context, trial counsel's failure to take corrective steps after Grant testified that she believed H and A, in combination with his failure to object to the prosecutor's suggestions that the children could not have fooled several experts into believing them, would have tended to bolster the children's credibility and, therefore, to affect the verdict. *See Simpson v. Coursey*, 224 Or App 145, 153-54, 197 P3d 68 (2008), *rev den*, 346 Or 184 (2009) (the possibility of prejudice associated with a trial lawyer's failure to strike vouching testimony and to request a curative instruction was "magnified by the fact that the criminal trial appear[ed] to have been an extremely close case for the jury," as reflected in a verdict acquitting the petitioner of some counts and returning 10-to-2 guilty verdicts on another). It follows that petitioner is entitled to post-conviction relief in the form of a new trial.

Reversed and remanded.

---

[7] In an affidavit that the state submitted as evidence in the post-conviction proceeding, the prosecutor acknowledged that "[t]his was a credibility contest ***."