Submitted March 13; reversed and remanded as to first claim, otherwise affirmed May 20, 2020

LAMAR ALEX DAVIS,
*Petitioner-Appellant,*

*v.*

Brad CAIN,
Superintendent,
Snake River Correctional Institution,
*Defendant-Respondent.*

Malheur County Circuit Court
16CV27407; A168254

467 P3d 816

In this post-conviction proceeding, petitioner appeals a judgment denying him post-conviction relief. Petitioner was charged and tried for first-degree rape, based on his allegedly having sexual intercourse with a physically helpless person, J. Petitioner claims that his trial counsel was constitutionally inadequate for failing to object to the prosecutor's vouching in opening statement regarding the state's key witness, Shannon. The prosecutor preemptively addressed the possibility that Shannon might change her story at trial, explaining to the jury that what Shannon had told the police was true and that, if she lied at trial, it was his job to try to get her to tell the truth. Shannon subsequently changed her story somewhat, although not as much as the prosecutor had anticipated. The jury found petitioner guilty, and he was convicted. Petitioner petitioned for post-conviction relief, claiming inadequate assistance of trial counsel in failing to object to the prosecutor's vouching. The superintendent does not dispute that the prosecutor vouched but argues that petitioner's trial counsel's lack of objection was strategically reasonable and that petitioner did not demonstrate prejudice. *Held*: The post-conviction court erred in denying post-conviction relief. The statements made by the prosecutor constituted improper vouching. Under the circumstances, it was not objectively reasonable for petitioner's trial counsel not to object to the vouching, so counsel rendered inadequate assistance. Given the significance of Shannon's credibility and how the case was tried, trial counsel's inadequate assistance could have tended to affect the outcome of the case.

Reversed and remanded as to first claim; otherwise affirmed.

Patricia A. Sullivan, Senior Judge.

Jedediah Peterson and O'Connor Weber LLC filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Rolf C. Moan, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

AOYAGI, J.

Reversed and remanded as to first claim; otherwise affirmed.

**AOYAGI, J.**

In this post-conviction proceeding, petitioner asserts that the post-conviction court erred in denying him relief on his first claim for post-conviction relief, because his trial counsel was constitutionally inadequate in failing to object when the prosecutor engaged in vouching regarding the state's key witness during opening statement. In response, the superintendent does not dispute that the prosecutor engaged in vouching but argues that petitioner's trial counsel's lack of objection was strategically reasonable or that petitioner did not demonstrate prejudice. As explained below, we agree with petitioner and, accordingly, reverse and remand on the first claim.

### FACTS

We are bound by the post-conviction court's factual findings so long as they are supported by evidence in the record. *Ayer v. Coursey*, 253 Or App 726, 728, 292 P3d 595 (2012). "If the post-conviction court did not expressly make factual findings, and there is evidence from which the facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion." *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968) (internal quotation marks omitted).

Petitioner was convicted of first-degree rape, ORS 163.375, based on the following evidence. On a summer night, J celebrated a birthday with some friends, including Shannon and Spriggs. They eventually went to Spriggs' apartment. Because Spriggs was moving out, there was no furniture in the apartment, except a mattress and box spring in the living room. Petitioner—who was an acquaintance of J's and Shannon's—arrived while the group was talking. J and Shannon eventually fell asleep on the mattress. A friend named Jason arrived and woke up Shannon, who went to the bathroom. When Shannon had been in the bathroom for five to 10 minutes, Jason came to the door and told her that J was having sex. Shannon came out and saw petitioner on top of J, having sex with her. J was moaning. Shannon doubted that J would have sex with petitioner when sober, so she pulled on J's arm to "see if she knew what she was doing" but got no response. Shannon asked

petitioner if J had said they could have sex, and petitioner answered affirmatively ("uh-huh"). A few minutes later, Shannon checked on J again and slapped her, but J still did not say anything to Shannon. When Shannon checked on J a third time, petitioner had left.

The next morning, Shannon asked J if she remembered having sex with petitioner. J did not remember. J obtained a sexual assault examination, and petitioner's DNA was found in J's cervix and vagina. Officer Gilhuber interviewed Shannon by telephone within a few days of the incident.

The only witnesses at petitioner's trial were Shannon, Gilhuber, J, and a nurse; petitioner did not testify. The prosecutor and defense counsel both told the jury that the key issue for the entire trial was Shannon's credibility. J did not remember having sex with petitioner, and the prosecutor expressly told the jury that her credibility was not even at issue as a result. The nurse testified about the DNA evidence. Shannon and Gilhuber testified generally consistently with the above description of the facts, but there was at least one significant conflict in their testimony, relevant to the issue of J's physical helplessness.

As to J's physical helplessness, Gilhuber testified that Shannon had told him in her 2011 interview that it "appeared" that J "was asleep" during the sex. By contrast, Shannon testified at trial that J was "[v]ery, very intoxicated," but that her eyes were "a little bit open," and that J sometimes looked like that when she was awake but drunk. Shannon insisted that she had "never told anybody that [J] was sleeping," that she "couldn't honestly say" whether J "was sleeping or not," and that she had thought at the time that J was awake. The prosecutor relied on Gilhuber's testimony and Shannon's actions in pulling on J's arm and slapping her to repeatedly argue that J was "passed out" or "unconscious" when petitioner had sex with her and that Shannon was now changing her story to claim that J was awake. Meanwhile, defense counsel argued that Shannon had never changed her story and that it was Gilhuber who either misunderstood or misreported what Shannon had said.

The jury found petitioner guilty of first-degree rape, based on J having been incapable of consent due to physical

helplessness. *See* ORS 163.375(1)(d) ("A person who has sexual intercourse with another person commits the crime of rape in the first degree if * * * [t]he victim is incapable of consent by reason of * * * physical helplessness."). Petitioner unsuccessfully appealed the resulting conviction.

Petitioner subsequently filed a petition for post-conviction relief, alleging in the first claim for post-conviction relief that his trial counsel was constitutionally inadequate for failing to object to vouching statements made by the prosecutor during opening statement. In his opening statement, the prosecutor had commented on the "great job" that Gilhuber did interviewing witnesses and documenting what they said. Without explanation, the prosecutor then raised the possibility that Shannon might change her story at trial. He told the jury that, if Shannon told "the truth" and testified consistently with what she told Gilhuber, it would be an easy conviction, but that, if she did not tell the truth and changed her story, he (the prosecutor) would "not back off" because that was his job.

Because it goes to the heart of petitioner's appeal, we quote in its entirety the relevant portion of the prosecutor's opening statement:

"Brandae Shannon was one of those people that he talked to, and Brandae Shannon laid the whole thing out, okay? A couple of months pass—two and a half months and guess what? Things have changed in the meantime.

"Why? I don't know. I'm not sure it's going to make much difference. You're going to be searching and listening, probably to Brandae to find out why things have changed.

"Now, she might tell you things have not changed, that I've been telling the truth about this from the get-go. Get somebody into Court, got to take somebody to grand—you know, we've got to take witnesses to Grand Jury. They testify under oath. It's not a two-part system, and there is no defense attorney there and stuff—but they come, and they tell their story under oath. Now, if Brandae Shannon comes in here and tells you, you know what? I've been telling the truth all along about this case. I spoke to Officer Gilhuber. I told him the truth about what happened and what I told Officer Gilhuber is, in fact, what I'm going to testify to. If that happens, this case is over. You are going to have an

easy decision because what Brandae Shannon tells the officer is that the Defendant did exactly what he's charged with.

"I asked, I think maybe, I guess I asked all of you—when I was asking general questions—about whether you are going to be comfortable if there gets to be a little bit of conflict here, okay?

"*There may or may not be, okay, but Brandae Shannon assures us that she will tell the truth and does tell the truth, probably not going to be much conflict. If she doesn't, I can tell you right now, do not expect me to back off. Do not expect me to just let her change her story and say, okay, well, whatever, we'll just go home.*"

(Emphasis added.)

Later in his opening statement, the prosecutor returned to the issue again, while describing who would testify and what the evidence would be:

"In the end, it's going to come down to Brandae Shannon, and *she may not want to, like I told you, to tell you how this happened*. Again, you may be curious about the motive, but does it really matter, does it really matter? Why she changed her statement? The question is, did she change her statement, and it may be like pulling teeth. I don't know, but *if we have to pull teeth, we are going to pull teeth. If she just tells you, this will go easy*. I hope you don't hold that against me because *that's what my job is and, in all honesty, I can't imagine any of you would expect me to back down from it*."

(Emphases added.)

In his petition for post-conviction relief, petitioner claimed that his trial counsel provided constitutionally inadequate assistance when he did not object to the prosecutor's statements as impermissible vouching regarding the state's key witness, Shannon.[1] In response, the superintendent

_____

[1] Petitioner asserts that his trial counsel provided both inadequate assistance under Article I, section 11, of the Oregon Constitution and ineffective assistance under the Sixth and Fourteenth Amendments to the United States Constitution. Because the state constitutional issue is dispositive, we do not reach the federal constitutional issue. *See Docken v. Myrick*, 287 Or App 260, 263 n 1, 402 P3d 755 (2017). In any event, petitioner makes the same arguments under both constitutions.

submitted a declaration from petitioner's trial counsel. Trial counsel attested that he had no "independent recollection of the prosecutor's opening statement." However, he described his "standard practice" as being "to pay close attention to the argument the prosecution makes during opening statement and closing and to how the jury is responding to the prosecution's arguments." Then, if he "believe[s] a potentially improper argument made by the prosecutor is having an impact on the jury that could be negative to my client, I object." Trial counsel concluded, "Based on that standard practice, I presume that I did not believe the argument made by the prosecutor during opening in this case was having an impact on the jury."[2]

The post-conviction court denied relief. In its written judgment, the court concluded that it was not improper or objectionable for the prosecutor to state that a witness's trial testimony "may differ from the initial police report," that defense counsel's decision not to object during the prosecutor's opening statement was "tactically sound," that petitioner had "not shown prejudice," and that "the jury was properly instructed that opening remarks are not evidence."[3] Petitioner appeals.

## ANALYSIS

To obtain post-conviction relief, a petitioner must establish a substantial violation of his constitutional rights. ORS 138.530(1)(a). One of those constitutional rights is the

---

[2] In full, as relevant to that claim for relief, petitioner's trial counsel attested:

"Mr. Davis asserts that my decision not to object to comments made by the prosecutor during opening statement constituted ineffective assistance of counsel. I do not have an independent recollection of the prosecutor's opening statement. I do know that my standard practice is to pay close attention to the argument the prosecution makes during opening statement and closing and to how the jury is responding to the prosecution's arguments. If I believe a potentially improper argument made by the prosecutor is having an impact on the jury that could be negative to my client, I object. Based on that standard practice, I presume that I did not believe the argument made by the prosecutor during opening in this case as having an impact on the jury."

[3] The post-conviction court also concluded that the prosecutor's comment about Gilhuber doing a "great job" interviewing witness and documenting what they said did not constitute vouching for Gilhuber, "as it is not a comment on credibility." We agree with the post-conviction court on that point and reject petitioner's argument on appeal with respect to that specific portion of the prosecutor's opening statement.

right to adequate assistance of counsel under Article I, section 11, of the Oregon Constitution. *Krummacher v. Gierloff*, 290 Or 867, 871-72, 627 P2d 458 (1981).

Evaluating whether a lawyer rendered inadequate assistance is a two-step inquiry. *Montez v. Czerniak*, 355 Or 1, 7, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014). First, we determine whether petitioner demonstrated by a preponderance of the evidence that his lawyer failed to exercise reasonable professional skill and judgment. *Id*. "In doing so, we do not inquire into counsel's subjective state of mind; instead, we inquire into the objective reasonableness of counsel's performance." *Id*. at 8. Second, if petitioner met his burden at the first step, we determine whether counsel's deficient performance had a tendency to affect the result of the trial. *Id*. at 7. That is, we determine whether it "*could have tended to affect* the outcome of the case." *Green v. Franke*, 357 Or 301, 323, 350 P3d 188 (2015) (internal quotation marks omitted; emphasis in original). "Whether a petitioner has demonstrated prejudice is a question of law that, in turn, may depend on the postconviction court's findings of fact." *Wyatt v. Czerniak*, 223 Or App 307, 311, 195 P3d 912 (2008). We review the postconviction court's determinations for legal error. *Montez*, 355 Or at 8.

Here, the first question is whether the prosecutor's statements about Shannon constituted vouching. Petitioner argues, and the superintendent does not dispute, that they did. We agree.

"Vouching" refers to the expression of one's personal opinion about the credibility of a witness. *See State v. Chandler*, 360 Or 323, 330-31, 380 P3d 932 (2016) (discussing history of vouching prohibition, which is a "judicially created rule"). Because credibility determinations are the exclusive province of the jury, witnesses are categorically prohibited from expressing a view on whether another witness is "telling the truth." *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983); *accord State v. Black*, 364 Or 579, 587-88, 437 P3d 1121 (2019). In addition to the prohibition against witness vouching, "lawyers are similarly prohibited from giving their personal opinions on the credibility

of witnesses." *State v. Sperou*, 365 Or 121, 129, 442 P3d 581 (2019).

In that vein, prosecutors have substantial leeway to argue about the *evidence* and to try to persuade jurors to their view of the evidence, but they may not interject their own personal views of a witness's credibility. *Id.* at 135; *see also Heroff v. Coursey*, 280 Or App 177, 194, 380 P3d 1032 (2016), *rev den*, 360 Or 851 (2017) ("[I]t is permissible for a prosecutor to argue that the jury should infer that a witness is credible based on the evidence in the record, so long as the prosecutor does not vouch for the witness by interjecting his or her personal opinion of the witness's credibility."). Prosecutorial vouching is especially problematic when it not only reveals the prosecutor's personal opinion of a witness's credibility but implies that that opinion is based on something more than just the prosecutor's assessment of the trial evidence:

> "It is improper for counsel to interject his personal appraisal of the witnesses' credibility in a way which would suggest to the jury that the appraisal is based upon counsel's own knowledge of facts not introduced into evidence. \*\*\* The rule is sometimes stated more broadly, making improper any comment by counsel upon the credibility of his witnesses."

*State v. Parker*, 235 Or 366, 377-78, 384 P2d 986 (1963); *see also Sperou*, 365 Or at 129 ("The rationale for the [anti-vouching] principle is that counsel's credibility opinions are not evidence and are sometimes based on facts not in evidence—thus, they tend to distract the jury from its duty to base its verdict on the evidence at trial."); *United States v. Edwards*, 154 F3d 915, 922 (9th Cir 1995) (the rule against vouching was "designed to prevent prosecutors from taking advantage of the natural tendency of jury members to believe in the honesty of lawyers in general, and government attorneys in particular").

In this case, the prosecutor crossed the line into vouching. The thrust of his comments in opening statement was that he *knew* that Shannon had told the truth to Gilhuber before trial and that, if she testified otherwise at trial, she would be lying. Moreover, if she changed her

story on the stand, it was his "job" to try to get her to tell the truth, even if it meant "pulling teeth." *Cf. United States v. Smith*, 962 F2d 923, 928 (9th Cir 1992) (prosecutor made numerous improper vouching statements, including invoking the role of the government with statements such as, "And the government's job is to find the truth, to ferret through all this confusion, to ferret through all the smoke screens and lead you to the truth."). The prosecutor did not mention there being any evidence that would persuade the jury that Shannon's original statement was the most credible. To the contrary, he indicated that the jury might never know why she changed her story, if she did, but that it did not matter really, because all that mattered was that Shannon's original statements to Gilhuber and the grand jury were the truth. To put it simply, the prosecutor's statements about Shannon's credibility were in the nature of "take my word for it," not "let me show you."

Having concluded that the prosecutor engaged in vouching, the next question is whether not objecting was a reasonable response under the circumstances, or whether petitioner's trial counsel failed to exercise reasonable professional skill and judgment. The post-conviction court found that trial counsel made a "decision" not to object that was "tactically sound." No one challenges the court's finding that trial counsel made a conscious decision not to object, so it is binding. *See Lotches v. Premo*, 257 Or App 513, 517, 306 P3d 768 (2013) (relying on the post-conviction court's "unchallenged factual findings" in reviewing denial of post-conviction relief).[4]

When trial counsel makes a "conscious choice" not to do something, "we evaluate the reasonableness of that conscious decision under the circumstances that confronted counsel at the time of the decision." *Sullivan v. Popoff*, 274 Or App 222, 231, 360 P3d 625 (2015); *see also Grant v. Coursey*, 277 Or App 165, 182-83, 370 P3d 892 (2016) (applying reasonableness standard to trial counsel's strategic decisions, including his conscious choice not to object to

---

[4] We express no opinion on whether trial counsel's declaration was sufficient to support the post-conviction court's finding that trial counsel made a conscious "tactical choice" not to object to the prosecutor's vouching.

certain statements by the prosecutor in closing). Here, the superintendent argues that not objecting was a reasonable choice because trial counsel may have viewed it as beneficial to petitioner and detrimental to the state for the state to be suggesting that its own key witness might lie on the stand.

The logic of the superintendent's argument does not withstand scrutiny. In his opening statement, the prosecutor indicated that he did not know whether Shannon would change her story. No matter what happened at that point, there was no benefit to petitioner in letting the prosecutor vouch for Shannon's original statements to Gilhuber. If Shannon changed her story on the stand, that certainly could benefit petitioner, in that it would likely damage her credibility by requiring the jury to discern when she was telling the truth—and when she was not. But, in that scenario, petitioner would not be *better off* because the prosecutor had foreseen that possibility and preemptively vouched for Shannon's original statements to Gilhuber (and preemptively discredited her trial testimony). Conversely, if Shannon did *not* change her story, the prosecutor's vouching statements would only add to Shannon's credibility, especially given the prosecutor's allusion to a possible personal reason that she might want to change her story at trial. In the context of the prosecutor's vouching statements, Shannon not changing her story would only bolster her credibility by suggesting that she could not bring herself to lie.

Thus, no matter what happened when Shannon testified, allowing the prosecutor to preemptively vouch for the truth of Shannon's statements to Gilhuber (and vouch against any contradictory statements that she might make at trial) offered no strategic benefit to petitioner. We are therefore unpersuaded by the superintendent's argument that it was objectively reasonable for petitioner's trial counsel not to object to the vouching because it could benefit petitioner. *See Berg v. Nooth*, 258 Or App 286, 298, 309 P3d 164 (2013) (holding that trial counsel performed deficiently in failing to object to vouching by a witness and by the prosecutor, where "[t]he record reveal[ed] no way in which petitioner's defense could have benefitted from" the vouching).

There is also the possibility that petitioner's trial counsel recognized that the prosecutor was vouching regarding Shannon but decided not to object simply because the jury was not visibly affected by the vouching. It appears that the post-conviction court may have relied on that premise in ruling as it did. The superintendent does not defend such a strategy as objectively reasonable, and we conclude that it is not. *See Montez*, 355 Or at 8 (our inquiry is into the "objective reasonableness of counsel's performance"). It is not objectively reasonable to not object to prosecutorial vouching based solely on the lack of a visible reaction by the jurors, at least where, as here, the prosecutor commented directly on the credibility of the undisputed key witness and did it again in the absence of an objection the first time.[5] *See Krummacher*, 290 Or at 875-76 ("[I]f counsel exercises reasonable professional skill and judgment, a reviewing court will not second-guess the lawyer in the name of the constitution, but neither will the court ignore decisions made in the conduct of the defense which reflect an absence or suspension of professional skill and judgment.").

Petitioner's trial counsel therefore failed to exercise reasonable professional skill and judgment when he failed to object to the prosecutor's vouching statements.

That brings us to the final question, prejudice, which requires us to determine whether counsel's deficient performance could have tended to affect the result of the trial. *Green*, 357 Or at 323. In concluding that petitioner failed to establish prejudice, the post-conviction court appears to have relied on the trial court's general instructions at the beginning of trial, specifically the instruction that "opening statements and closing arguments are intended to assist you in understanding the evidence and applying the law to that evidence; however, those statements and arguments are not evidence."

_____

[5] We recognize that good reasons exist for lawyers not to object unnecessarily or excessively during opening and closing statements. We also recognize that lawyers often consider how the jury seems to be reacting in deciding whether to object to something that is technically not allowed but probably harmless. There is nothing wrong with taking such considerations into account, but it does not follow that a jury's lack of visible reaction universally excuses any lack of objection by defense counsel.

We begin our discussion of prejudice by recognizing that vouching by witnesses is so inherently problematic that the Supreme Court has advised trial judges to summarily cut off a vouching question to a witness, *sua sponte*, "before a jury is contaminated by it." *State v. Milbradt*, 305 Or 621, 630, 756 P2d 620 (1988). Relatedly, at least with respect to "true" vouching, a trial court may commit plain error if it fails to *sua sponte* address vouching by a witness. *See State v. Corkill*, 262 Or App 543, 552, 325 P3d 796, *rev den*, 355 Or 751 (2014); *State v. Higgins*, 258 Or App 177, 180-81, 308 P3d 352 (2013), *rev den*, 354 Or 700 (2014) (trial court plainly erred by failing to strike *sua sponte* a mother's testimony that she "knew for sure" that her daughter was not lying about a rape); *State v. Lowell*, 249 Or App 364, 366-68, 369, 277 P3d 588 (2012) (trial court plainly erred by failing to strike *sua sponte* a police detective's testimony that he "didn't think that [the defendant] was being very honest and upfront"). In *Sperou*, 365 Or at 140, the Supreme Court reiterated Oregon's strong rule against vouching, noting that, "[i]n general, witness vouching in Oregon is considered prejudicial, so much so in fact that it sometimes requires intervention by the trial court even when parties fail to object to it."

To date, we have not reversed a conviction on direct appeal on the basis that a trial court plainly erred in failing, *sua sponte*, to address vouching by a prosecutor. However, that does not mean that vouching by prosecutors is necessarily less problematic than vouching by witnesses, but only that the law is better established regarding vouching by witnesses (as relevant to plain error review) and that we decide each case on its own facts. *E.g.*, *State v. Boauod*, 302 Or App 67, 75-77, 459 P3d 903 (2020) (holding that the trial court did not plainly err when it did not declare a mistrial, *sua sponte*, or issue a corrective instruction, *sua sponte*, after the prosecutor engaged in alleged vouching).

In addition to making clear that it takes vouching very seriously, the Supreme Court has indicated that a jury instruction given to address vouching may need to be quite specific to ensure a fair trial. In *Milbradt*, a psychologist improperly commented on the credibility of two sex abuse complainants during her trial testimony. 305 Or at 628-29.

The trial court overruled defense counsel's objection and allowed the testimony. *Id*. at 627. After a break, however, the court referred to the psychologist's earlier testimony about "the capacity of either one of these victims of manufacturing a story" and instructed the jury, in part:

> "You people are the ones who have to make the determination of whether or not either one of these victims have fabricated a story with respect to defendant in this case. And you, and you alone, must make that determination. The opinion of an expert, or anyone else cannot be substituted for that obligation of the jurors. Do you understand what I just told you? In other words, you are the ultimate judges of the ultimate facts, very basically, the credibility of the witnesses when they take the stand."

*Id*. at 627-28.

The Supreme Court concluded that the trial court erred in not sustaining the objection. *Id*. at 630. Further, "[t]he admission of the testimony constituted prejudicial error and was not 'cured' by the instruction." *Id*. "Even though the trial judge attempted to convey to the jurors that they would be the ultimate judges of the credibility of the two young women, he did not instruct the jury to disregard the lengthy testimony by [the psychologist]." *Id*. at 628. "This testimony was critical to the state's case" in a case that was a "typical 'credibility contest.'" *Id*. The court left open whether there might have been some form of instruction that the trial court could have given to cure the error, short of declaring a mistrial, but in any event concluded that the instruction that it gave was insufficient because it was not specific enough, in that the trial court "failed to tell the jury to disregard totally the testimony of [the psychologist]." *Id*. at 630.

Other decisions also have suggested that a specific instruction is key to countering improper vouching. For example, in *State v. Doolin*, 251 Or 56, 57-58, 444 P2d 541 (1968), the prosecutor made a vouching statement that the defense counsel interrupted mid-sentence with a strong objection, moving for a mistrial on the grounds that the prosecutor's statement was "an absolute false statement of the law." The trial court denied the motion but immediately and specifically instructed the jury to disregard the prosecutor's

statement. *Id*. at 57. The Supreme Court concluded that the trial court did not err in denying a mistrial in those circumstances. *Id*. at 58. In *State v. Wasyluk*, 275 Or App 149, 150, 363 P3d 519 (2016), the prosecutor repeatedly said "I think" and "I believe" in making arguments, the defendant objected each time on vouching grounds, and the trial court sustained the objections and instructed the jury on the issue. We affirmed the denial of a mistrial, "writ[ing] primarily to point out the trial court's careful and attentive response to defendant's concern that the comments could deny him a fair trial." *Id*. That response included the trial court confirming the validity of the defense objections, sustaining the objections, reminding the jury that the lawyers' arguments were not evidence, advising the prosecutor to say "I submit or something like that as opposed to I believe or I think," and giving the jury a "very specific" and direct instruction to disregard the prosecutor's indications of "thoughts" and "beliefs" and not consider them "in any way, shape, or form." *Id*. at 150-51.[6]

Also instructive is *State v. Worth*, 231 Or App 69, 218 P3d 166 (2009), *rev den*, 347 Or 718 (2010), which did not involve vouching but did address the adequacy of a jury instruction to ameliorate prosecutorial misstatements. In *Worth*, we concluded that the defendant was denied a fair trial when the prosecutor made three misstatements about the presumption of innocence, and the trial court corrected the prosecutor the first time but overruled defense counsel's next two objections. *Id*. at 78-79. Of particular relevance here, we concluded that the trial court's subsequent giving of a "generic instruction" on the presumption of innocence was not enough to prevent the trial court's error from denying the defendant a fair trial, because the generic instruction did not address the prosecutor's specific misstatements about the presumption (which pertained to the presumption's duration) and therefore did not adequately resolve

---

[6] Similarly but in a slightly different posture, in *State v. Fulmer*, we held that the trial court did not err in admitting certain evidence in a bench trial, even if it contained improper vouching statements, where, as soon as the defendant objected, the trial court "explicitly stated" that it would accept the evidence only for one specific purpose, "not as a comment on defendant's credibility." 229 Or App 386, 395, 211 P3d 942 (2009).

the potential confusion that those misstatements created. *Id*. at 79.[7]

In this case, if petitioner's trial counsel had objected to the prosecutor's vouching statements regarding Shannon, the trial court might well have been able to give a specific instruction that would have ensured petitioner a fair trial. That is, petitioner was not necessarily entitled to a mistrial. The general instruction that the trial court gave at the beginning of trial, however, was too generic under the circumstances to reliably neutralize the effect of the specific vouching in which the prosecutor engaged. If a general instruction at the beginning of trial that opening and closing statements are "not evidence" automatically inoculated the prosecution from the consequences of vouching, it would effectively give prosecutors *carte blanche* to engage in vouching.

That is not to say that a criminal defendant necessarily will have been denied a fair trial in any case in which vouching occurs and a specific instruction is not given. We do not foreclose the possibility of a circumstance in which vouching occurs but is so mild or passing that a well-stated general instruction would be sufficient to ensure a fair trial, or in which vouching occurs but is successfully addressed by strong and unambiguous general instructions. *Cf. Grant*, 277 Or App at 178-81 (although prosecutor misstated the evidence during closing argument, the petitioner's trial counsel was not deficient for failing to address it, where the jury received multiple instructions before and after closing to the effect that it needed to pay close attention to the evidence and decide the facts itself, regardless of how the lawyers described the evidence). There is also the possibility that the record in a particular case may affirmatively show that the vouching ultimately did not prejudice the petitioner,

---

[7] Although *Milbradt* and *Worth* were direct appeals, "there appears to be little distinction between an assessment whether a trial court error was 'prejudicial' to a probationer and an assessment of 'harmlessness' in an appeal from a judgment of conviction." *State v. Dowty*, 299 Or App 762, 775, 452 P3d 983 (2019). Here, if a general instruction that opening and closing statements are "not evidence" rendered the prosecutor's vouching statements harmless, it would seem to also render them nonprejudicial. Conversely, if they were not harmless despite the instruction, they would also likely be prejudicial despite the instruction.

regardless of the quality of the instructions. *E.g.*, *Heroff*, 280 Or App at 192 (a witness's vouching statement did not prejudice the petitioner, where it related solely to a crime of which the petitioner was ultimately acquitted by the jury).

Here, however, the prosecutor vouched for the undisputed key witness at trial, in a case in which the victim herself had almost no memory of the night, and no other eyewitnesses testified. The prosecutor's vouching statements were clear and deliberate, not mild or passing.[8] Moreover, the statements not only revealed the prosecutor's personal opinion as to what happened, but they implied that he actually *knew* the truth, beyond just having a particular view of the evidence that the jury would hear, and that his job as a prosecutor was to get Shannon to tell that truth if she tried to lie. On this record, the general beginning-of-trial instruction that opening and closing statements are "not evidence" did not adequately advise the jury that it could not consider *at all* the prosecutor's personal opinion that Shannon had told the truth in her police interview.[9]

The prosecutor's vouching statements went to the heart of the state's case—the credibility of the key witness, Shannon. At trial, Shannon apparently did not change her story as much as the prosecutor anticipated that she might (or so he told the jury), but she did directly contradict Gilhuber's claim that Shannon had told him in her 2011 interview that J had "appeared" to be "asleep" when petitioner was having sex with her. Shannon expressly denied ever having told Gilhuber or anyone else that J "was sleeping." Shannon

_____

[8] We do not mean to suggest that the prosecutor acted deliberately in the sense of intending to act improperly. We express no opinion on that issue and cast no aspersions. Our concern is only with the nature of the statements that were made and their potential effect on the jury in terms of petitioner receiving a fair trial.

[9] In concluding that petitioner did not establish prejudice, the post-conviction court appears to have relied solely on the trial court's instruction that opening and closing statements are "not evidence." The superintendent also points to another beginning-of-trial instruction, in which the trial court told the jury that it was their "sole responsibility to make decisions about the facts of this case" and that they "must evaluate the evidence to determine how reliable or how believable that evidence is." The superintendent does not develop his argument about that instruction, beyond citing it, and it does not affect our conclusion. Like the other instruction, if not more so, it failed to address specifically enough the improper prosecutorial vouching.

testified that J was "[v]ery, very intoxicated" but that J's eyes were "a little bit open," that she "couldn't honestly say" whether J "was sleeping or not," and that at the time she thought J was awake. Whether J was awake could well have been significant to the jury, in terms of whether the state had proved beyond a reasonable doubt that J was "physically helpless" when petitioner sexually penetrated her—the basis for the first-degree rape charge—where the state had argued throughout petitioner's trial that J was physically helpless because she was "asleep," "unconscious," or "passed out" at the time.[10] Shannon's credibility was therefore a significant issue at trial; indeed, both the prosecutor and defense counsel told the jury in their opening statements that it would be *the* issue at trial.

Finally, we note that this was a very short trial—the opening statements were given on a Wednesday afternoon, and the last witness testified first thing on Thursday morning—and nothing else that happened during trial ameliorated the prosecutor's improper vouching in opening. In closing argument, the prosecutor focused more on the trial evidence than he had in opening. However, he continued to make statements about Shannon's credibility in line with his earlier statements and certainly did nothing to disavow his earlier vouching, which, again, implied that he knew the truth, regardless of Shannon's testimony at trial.[11]

---

[10] Throughout petitioner's 2011 trial, the state argued and sought to prove that J was physically helpless because she was "asleep," "unconscious," or "passed out." It also pushed back hard against evidence that J was "awake," albeit drunk, possibly in part because Shannon testified that J had a history of having sex while drunk and did not always remember it. At the close of evidence, the trial court instructed the jury that "[p]hysically helpless means a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act." Having reviewed the entire transcript, we do not doubt that whether the jury believed Shannon's testimony that J was "awake" could have had a tendency to affect the outcome of the case.

[11] For example, the prosecutor said in closing argument that Shannon "wasn't quite as difficult to deal with as [he] expected" but that, "[c]ontrary to her claim, she hasn't always told the same story about this, she's changed her story to save face for whatever particular reason," but "[r]eally who cares what the reason is?" The prosecutor then pointed to the difference between Gilhuber's and Shannon's testimony as to whether Shannon thought J was asleep, emphasizing that Shannon had "volunteered" her testimony on that point and that he "didn't ask her about [it] *** [f]rankly because I was afraid she was going to lie about it."

On the whole, we conclude that trial counsel's failure to object to the prosecutor's vouching in opening statement could have tended to affect the outcome of the trial. *See Green*, 357 Or at 322-23 (stating prejudice standard, and further stating that, "where the effect of inadequate assistance of counsel on the outcome of a jury trial is at issue, it is inappropriate to use a 'probability' standard for assessing prejudice. Instead, because many different factors can affect the outcome of a jury trial, in that setting, the tendency to affect the outcome standard demands more than mere possibility, but less than probability."). It follows that the post-conviction court erred in denying relief to petitioner on his first claim for post-conviction relief. We therefore and reverse and remand for the court to grant relief on the first claim.

Reversed and remanded as to first claim; otherwise affirmed.